**Electronically Filed
Supreme Court
SCWC-14-0000472
25-AUG-2017
08:40 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

GOLD COAST NEIGHBORHOOD ASSOCIATION,
Respondent/Plaintiff-Appellee,

vs.

STATE OF HAWAI‘I,
Petitioner/Defendant-Appellant.
(CIV. NO. 07-1-1122)

STATE OF HAWAI‘I BY ITS ATTORNEY GENERAL,
Petitioner/Plaintiff-Appellant,

vs.

TROPIC SEAS, INC.; THE ASSOCIATION OF APARTMENT OWNERS OF
DIAMOND HEAD BEACH, INC.; OLIVIA CHEN LUM, TRUSTEE OF THE OLIVIA
CHEN LUM REVOCABLE LIVING TRUST; CLARENCE KWON HOU LUM, TRUSTEE
OF THE CLARENCE KWON HOU LUM TRUST AND TRUSTEE UNDER THE WILL
AND ESTATE OF CHOW SIN KUM LUM; JEANNE S.J. CHAN AND HOWARD N.H.
CHAN, TRUSTEES OF THE JEANNE S.J. CHAN TRUST; DIAMOND HEAD
AMBASSADOR HOTEL, LTD.; DIAMOND HEAD APARTMENTS, LTD.; C S
APARTMENTS, LTD.; THE ASSOCIATION OF APARTMENT OWNERS OF 2987
KALAKAUA CONDOMINIUM; TAHITIENNE, INCORPORATED; THE ASSOCIATION
OF APARTMENT OWNERS OF 3003 KALAKAUA, INC.; THE ASSOCIATION OF
APARTMENT OWNERS OF 3019 KALAKAUA, INC.,
Respondents/Defendants-Appellees.
(CIV. NO. 10-1-0888)

SCWC-14-0000472

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000472; CIV. NOS. 07-1-1122 AND 10-1-0888)

AUGUST 25, 2017

McKENNA AND POLLACK, JJ., AND CIRCUIT COURT JUDGE CASTAGNETTI,
IN PLACE OF WILSON, J., RECUSED, WITH NAKAYAMA, J., DISSENTING,
WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

## I.    INTRODUCTION

For at least the past 65 years, residents and visitors of Oʻahu have been free to walk along the cement path atop a seawall (the Seawall) on or near the seaward boundaries of property between 2943 Kalākaua Avenue and 3019 Kalākaua Avenue to access the beach, shoreline, and ocean in order to swim, surf, fish, and enjoy other activities of island living. Over the course of these many decades, the State has paid for and completed repairs and maintenance on the Seawall, enabling the public to continue to safely use the footpath. As recently as 2006, the Hawaiʻi State Legislature appropriated funds to repair the Seawall. However, the State shortly thereafter disclaimed any duty to maintain the Seawall, prompting commencement of this lawsuit to require the State to maintain and keep the Seawall in good and safe condition.

The Circuit Court of the First Circuit (circuit court) ruled that based on the applicable law and the uncontested evidence in this case, the State had obtained an easement for

public use over and across the Seawall by virtue of common law implied dedication. The Intermediate Court of Appeals (ICA) unanimously agreed. We conclude that in light of (1) Hawaii's long-standing principles of common law, (2) the historical significance and deep roots of implied dedication in this jurisdiction as evidenced by nearly 150 years of this court's precedent, and (3) the undisputed evidence in this case, the circuit court and the ICA correctly determined that the State obtained an easement over and across the Seawall by common law implied dedication.

In addition to determining that the State owned an easement over and across the Seawall by implied dedication, the circuit court also ruled that the State owned the real property under the Seawall by virtue of surrender under Hawaii Revised Statutes § 264-1(c)(2) (2007). Given this court's precedent, however, ownership of the Seawall was not transferred to the State by virtue of surrender. Thus, the circuit court and the ICA erred in concluding that the State owns the Seawall and the real property under the Seawall.

Given our disposition with respect to the merits of Gold Coast's claims in this case, we also determine whether the circuit court properly denied Gold Coast's motion for attorneys' fees and costs against the State. Although the ICA determined that an award of both fees and costs was permissible in this

case, we conclude that this ruling and the circuit court's ruling were both partially erroneous because the State waived its sovereign immunity with respect to costs but not attorneys' fees.

## II.      BACKGROUND

### A.      Construction, Public Use, and State Repairs to the Seawall

At issue in this case is a length of seawall that stretches from the seaward boundaries of property between 2943 Kalākaua Avenue and 3019 Kalākaua Avenue (the Seawall).  The Seawall runs along Waikiki's "Gold Coast," an area of condominiums and cooperative apartments located on ocean front lots near the Diamond Head end of Kalākaua Avenue.[1]  The Seawall was originally constructed by private parties over eighty years ago.  Since approximately 1930, the Seawall has been used by both residents and members of the general public, without interference or restriction, to access the ocean and to traverse along the Waikīkī coastline.

---

[1]    Specifically, the Seawall subject to the instant litigation borders eleven properties identified by the following Tax Map Key Nos. and owned or managed by the corresponding entities: Tropic Seas, Inc. (TMK No. 3-1-032:030), Diamond Head Beach Hotel (TMK No. 3-1-032:029), Diamond Head Ambassador Hotel, Ltd. (TMK Nos. 3-1-032:028, 27, 26), Diamond Head Apts. Ltd. (TMK No. 3-1-032:004), C S Apts Ltd. (TMK No. 3-1-032:003), 2987 Kalakaua Condominium (TMK No. 3-1-032:002), Tahitienne, Incorporated (TMK No. 3-1-032:001), 3003 Kalakaua (TMK No. 3-1-033:011), and 3019 Kalakaua Avenue (TMK No. 3-1-033:009).

For decades, the State has maintained the Seawall, conducted necessary repairs to the Seawall, and otherwise assumed responsibility to preserve and manage the Seawall.  In at least 1982, 1984, and 1993, the State conducted various repairs to the Seawall, and local and state appropriations were made by the relevant legislative bodies in contemplation of further repairs in at least 1989, 1992, and 2006.  By stipulation of the parties in this case, the repairs were described as follows:

- In June 1982, the State of Hawai'i Department of Land and Natural Resources (DLNR), Land Division, performed "emergency repair work" to "shore approximately 40 feet of the Seawall along the boundary of Diamond Head Apartments." By 1981 Haw. Sess. Laws Act 1, Item K-2, the State legislature authorized the expenditure of $25,000.00 for these repairs.

- Sometime in 1982, the DLNR, Land Division, performed repairs and "rehabilitated broken sections of the Seawall" from the Elks Club property to near the Diamond Head end of Kalākaua Avenue.  The funding for the repairs was appropriated by 1981 Haw. Sess. Laws Act 1, Item K-2, and by 1981 Haw. Sess. Laws Act 264, Item K-2.

- "Sometime after May 1984," the State performed additional repair work on "one or more portions of the Seawalls pursuant to work identified as Job No. 1-0L-31, Waikiki Seawall Walkway Rehabilitation, Phase III."  The original scope of this project consisted of "rehabilitating seawalls, constructing hand railing and other incidental and appurtenant work necessary to complete this project."[2]

---

[2]     A table included with the parties' stipulation shows that during Phase III, the State conducted the following repairs: "[c]rack repair on walkway--chip off loose material and epoxy the crack"; "[r]epair nosing at edge of walkway"; "[r]emove loose concrete topping and pour 4" thick x 3'6" wide concrete later"; "[r]epair walkway--remove loose concrete topping and replace with 2" thick cement mortar (Taper new concrete left to right, see G-2)"; and "[a]dd new concrete walkway on top of existing wall."

- On December 8, 1992, following Hurricane Iniki, the Honolulu City Council passed a resolution authorizing the DLNR "to rehabilitate the existing Seawall walkway located in Diamond Head, Oahu and identified by TMK Nos. 3-1-032:001, 002, 003, 004, 026, 027, 028 and 029, and 3-1-033:002, 003 , 004, 005, 006, 007, 008, 009, 010, 011, 053, and 056." The repair and rehabilitative work conducted pursuant to this project was limited to portions of the Seawall in front of the Diamond Head Ambassador Hotel. The construction was authorized by the Hawai'i legislature by 1989 Haw. Sess. Laws Act 316, Item K-11. Repairs were completed in September 1993 at a contract price of $609,605.00. Pursuant to this project, "the State built or rebuilt essentially the entire wall in front of . . . three properties" along the Seawall, although "to the extent the State built the wall makai of the then shoreline the wall [was] on State property."

- In an October 13, 1993 letter from the DLNR, the Manager-Chief Engineer of the DLNR stated that further repair work on the Seawall was scheduled for TMK Nos. 3-1-32:029, 004, 003, 002, 001, 3-1-033:011 and 009.

- In 2006, the Hawai'i legislature appropriated $2 million for "plans, design and construction for the resurfacing of the seawall and installation of railings along Waikiki's Gold Coast." The appropriation was included within H.B. 1900 in a section titled "Waikiki Seawall Improvements, Oahu."

(Emphases added.)

Since at least 1975, various assertions made by the State have further manifested its long-held position that the Seawall serves as a public right-of-way and that the State has the duty and responsibility to maintain the Seawall for use by the public. The parties stipulated that the following relevant documents would be entered into evidence in this case:

- A February 27, 1975 memorandum authored by Wallace W. Weatherwax, Deputy Attorney General (DAG Weatherwax), to the Department of Transportation's Harbors Division intended to resolve the Harbors Division's inquiry as to "whether or not the State has the responsibility to maintain and improve a public right of way which passes over a seawall located within" TMK No. 3-1-33-2 and TMK No. 3-1-33-53. In the memorandum, DAG Weatherwax stated the fact of "the use by the public of this right of way since

1930" and concluded that "the State has the responsibility to maintain the public right of way over the seawall."

• A 1982 Environmental Assessment issued by the DLNR regarding the repair of a portion of the Seawall near the Diamond Head Apartments, in which the DLNR stated that "[t]he top of the seawall serves as a public walkway for residents and beachgoers to traverse along the shores of Waikiki Beach" and that "[r]esidents, surfers, beachgoers and fishermen use the top of the seawall to traverse between the Diamond Head end of Waikiki Beach and Sans Souci Beach."

• A document dated May 1984 relating to the "Waikiki Seawall Walkway Rehabilitation" project stating that "the State has a right-of-way over the seawall and has obtained a right-of-entry onto" certain properties "for the rehabilitation of the seawall walkway."

• A "Notice of Determination (Negative Declaration)" relating to the "Waikiki Seawall Walkway Rehabilitation Project" issued by the DLNR, Water and Land Development Division, with a handwritten notation at the top identifying the document as "1992-10-23-OA-FEA-Waikiki Seawall Walkway," describing proposed repairs to the Seawall in the amount of $550,000.00 and stating that "the State of Hawai'i has a right-of-way over all the seawalls and walkways and is responsible to keep them in good and safe condition" and that "the walkways are used by the general public."

(Emphases added.)  Thus, for many decades, the Seawall has been enjoyed by members of the general public and repaired, maintained, and overseen by the State.

Gold Coast Neighborhood Association (Gold Coast) is "a non-profit incorporated organization doing business in the City and County of Honolulu, and is comprised of individuals and organizations that own, live in, or have an interest in real property along Kalakaua Avenue on the Waikiki coastline in the City and County of Honolulu, State of Hawai'i."  Many of the members of Gold Coast represent the apartments and condominiums

7

located along the Seawall.  Following an appropriation of funds to repair the Seawall by the Hawai‘i State Legislature in 2006, counsel for Gold Coast and representatives from the State discussed the need for maintenance to the Seawall.  However, at a point during these discussions, the State informed Gold Coast's counsel that it now disclaimed any duty to maintain the Seawall.

### B.    Circuit Court Proceedings

On June 22, 2007, Gold Coast filed a complaint against the State seeking a declaration from the circuit court that "the State is required to maintain the Seawall and keep it in good and safe condition."  In its complaint, Gold Coast identified the Seawall as bordering twenty-one properties on Kalākaua Avenue.  Gold Coast also sought an order awarding it attorneys' fees and costs "as allowed by law."

In July and August of 2007, the parties filed cross-motions for summary judgment.[3]  Gold Coast contended in its summary judgment motion that the State was obligated to maintain the Seawall by virtue of its ownership of the Seawall, or, in the alternative, by virtue of an easement over the Seawall.  The State rejected these arguments in its summary judgment motion

_____

[3]    The Honorable Eden E. Hifo presided over the summary judgment proceedings in this case.

and contended, inter alia, that Gold Coast had failed to join indispensable parties to the action because it had not joined all those property owners whose interests in property under or near the Seawall might be affected by the litigation.

Prior to the circuit court's ruling on the parties' summary judgment motions, Gold Coast filed a first amended complaint (First Amended Complaint) removing ten of the twenty-one properties and adding one property. At a continued hearing on the parties' summary judgment motions on August 20, 2008, the court heard oral argument on whether the First Amended Complaint "cured the problem" alleged by the State regarding indispensable parties to the lawsuit. The State contended that the First Amended Complaint was not sufficient to cure Gold Coast's failure to join indispensable parties, arguing in part that the various homeowners' associations were not legally authorized to represent private property owners in the litigation. Gold Coast responded that each of the properties named in the First Amended Complaint was represented by associations that had agreed on behalf of their members to join Gold Coast and support the lawsuit and that the associations were entitled to represent their property owners' interests. Thus, "each individual owner's interest [was] secured and represented" by the relevant association that was authorized to act on the owner's behalf.

At the close of the August 20, 2008 hearing, the court ruled that Gold Coast had not failed to join indispensable parties, reasoning that "given the First Amended Complaint . . . there have been amendments to ensure that the condominiums or co-ops that are contiguous to the seawalls that are identified by the TMKs in [the First Amended Complaint] are members of [Gold Coast], which is the party."  The court further elaborated that it did not construe "the fact that the individual owners of the condos are not named parties" to be an "impediment to the lawsuit going forward, inasmuch as the [Associations of Apartment Owners] bind them all."  The court then ruled that Gold Coast could proceed in the litigation under the theories of common law implied dedication and surrender under Hawaii Revised Statutes (HRS) § 264-1, but that both issues were subject to genuine issues of material fact precluding summary judgment.

On April 26, 2010, the State filed its own complaint for declaratory relief with the circuit court, naming as defendants some of the individual owners and associations of the properties included in Gold Coast's First Amended Complaint.  In its complaint, the State sought a declaration that "[the State] does not own the seawalls or the real property under the seawalls" and that "the State does not have an easement by prescription or implication over the seawalls."  The circuit

court, in accordance with the State's unopposed motion,[4] consolidated the case brought by Gold Coast with the case brought by the State.[5]

On March 18, 2011, the parties filed a First Stipulation of Facts (Stipulated Facts) pertaining to the identities of the parties and the portions of the seawall at issue in the case. The Stipulated Facts described past repair work and construction completed on the Seawall, including the State's performance of various repairs to the Seawall in 1982, 1984, and 1993, and local and state legislative appropriations in contemplation of further repairs in 1989, 1992, and 2006, as described in greater detail above. The parties stipulated to events surrounding the State's sale to the Gold Coast in 2003 of a non-exclusive easement for "the right, privilege, and authority to construct, use, maintain and repair" a ladder accessing the ocean from a 37-square-foot portion of land along the Seawall. The parties further stipulated that TMK No. 3-1-

---

[4]    The State in its motion to consolidate contended that it had "specifically" filed its complaint so that the disposition of the case relating to ownership and maintenance of the Seawall would "explicitly [bind]" the individual property owners and associations, rather than solely Gold Coast acting on their behalves.

[5]    On September 13, 2010, Gold Coast filed a second amended complaint (Second Amended Complaint) removing TMK No. 3-1-033:010 from the complaint. Thus, the current litigation involves eleven properties. These eleven properties are owned or managed by various entities, each of which is a member of Gold Coast. See supra note 1.

033:009 was subject to an "easement of right of way for pedestrians." The parties agreed that as otherwise stated by the Stipulated Facts, "the State does not hold an express easement over any of the seawalls [which are the] subject of these lawsuits."[6]

On March 22, 2011, the circuit court[7] held a bench trial at which three witnesses for Gold Coast testified.[8] June Anderson, a resident of Diamond Head Apartments on the Gold Coast since 1971, testified that she has regularly observed members of the public walking along the Seawall, climbing over the Seawall to access the ocean, and otherwise utilizing the Seawall for recreational purposes. Ms. Anderson also testified that before becoming a resident of her Gold Coast building, she visited the Waikīkī area as early as 1952 and traversed the Seawall as a general member of the public several times.[9]

---

[6]    Specifically, the Stipulated Facts relate that "[o]ther than as stated in paragraph 40, the State does not hold an express easement over any of the seawalls subject of these lawsuits." (Emphasis added.) However, because the Stipulated Facts does not contain a paragraph 40, it appears that this stipulation refers to the immediately preceding paragraph regarding the easement held by the State over TMK No. 3-1-033:009.

[7]    The Honorable Virginia L. Crandall presided over the trial.

[8]    Russel Tsuji, an official of DLNR, testified for the State regarding public access to the Seawall, the buildings located near the Seawall, and the appearance and condition of the Seawall.

[9]    The record reflects an agreement between the parties that declarations submitted by the three witnesses during summary judgment proceedings would be entered into the record in support of Gold Coast's claims. In the declaration submitted by Ms. Anderson, she further stated

(continued. . .)

12

According to Ms. Anderson, since 1971, she has never "seen anyone attempt to keep people from walking on the [S]eawall walkway." Ms. Anderson further testified that her building, Diamond Head Apartments, was not "insured for the [S]eawall" and that the residents have "never considered [the Seawall] [their] property really."[10] Similarly, Robert Gentry, a resident of the Gold Coast since 1982 and president of the Gold Coast Neighborhood Association, testified that from his residence, he observed a "[t]remendous amount of recreational activity" by members of the public utilizing the Seawall and the ocean beyond, including swimming, fishing, surfing, dog-walking, and lifeguarding activities. Mr. Gentry added that he has "never" tried to stop anyone from walking along the Seawall.[11] Mr.

---

(. . .continued)

that she "also observed many other people walking along the Diamond Head Seawall" during her visits to the area between 1952 and 1958.

[10] In her declaration, Ms. Anderson also stated that to the best of her knowledge, "during the time in which [she has] been familiar with the Diamond Head Seawall, no owner of property adjacent to the Diamond Head Seawall has ever blocked the public from accessing the Diamond Head Seawall, performed any repairs on the Diamond Head Seawall, or exerted any other similar form of control or act of ownership over the Diamond Head Seawall."

[11] In Mr. Gentry's declaration submitted during summary judgment proceedings, Mr. Gentry elaborated that to the best of his knowledge, (1) "no owner of property along the Diamond Head Seawall, including [Mr. Gentry] and other members of the [Gold Coast Neighborhood Association], has ever blocked the public from using the Diamond Head Seawall," (2) the Gold Coast Neighborhood Association "assumes that owners of property bordering the Diamond Head Seawall do not have the right to block the public from using the seawall," and (3) "owners of property along the Diamond Head Seawall . . . have acquiesced in the public's use of the Diamond Head Seawall as a walkway and for recreational purposes."

Gentry also noted that, to the best of his knowledge, his building has never had insurance over the walkway on the Seawall.

The circuit court heard additional testimony from Guy Bishaw, a Waikīkī resident who does not own property on the Gold Coast and who does not have a relationship with the Gold Coast Neighborhood Association, who described his continuous use of the Seawall for ocean access and other recreational purposes since the 1950s. Mr. Bishaw further testified that in all the time he has used the Seawall to reach various surf spots, no one has "ever tried to stop [him] from walking on the wall" or "told [him] that the seawall was private property and [he] better not walk on the wall."

On November 29, 2013, the circuit court issued its Findings of Fact, Conclusions of Law, and Order (Findings of Fact and Conclusions of Law). The circuit court determined that Gold Coast had prevailed on its implied dedication and surrender claims and was therefore "entitled to a declaratory ruling" that the State has an easement over and across the Seawall by implied dedication and that the State owns the Seawall and the real property under the Seawall by surrender.

In its Findings of Fact and Conclusions of Law, the circuit court made extensive findings of fact regarding the parties, the identification and characteristics of the

14

properties at issue, access to the Seawall from Kalākaua Avenue, the history of the State's repair work on the Seawall and communications by the State regarding its responsibility to maintain the Seawall, miscellaneous facts regarding various properties included in the lawsuit,[12] and a site visit conducted by the court and counsel for Gold Coast and the State. The court also made findings of fact regarding the public's use of the Seawall, stating in finding of fact (FOF) 103 that "[t]he public has used the Seawall for both shoreline and ocean access for decades and has done so without any apparent interference from any private landowners along the Gold Coast."

In its conclusions of law, the circuit court addressed common law implied dedication and also evaluated surrender under the Hawaii Revised Statutes.

Under the law of implied dedication, the circuit court stated that Gold Coast was required to demonstrate "an offer and acceptance of dedication both of which may be implied based on the circumstances." The court determined that if "regular and continuous use by the public" was the only evidence of implied

---

[12]    In finding of fact (FOF) 52, the court found that the property identified as TMK No. 3-1-033:009 was registered in land court. In FOF 105, the court also found that TMK No. 3-1-033:009 was subject to an express easement for pedestrian use in favor of the State. In FOF 106, the court found that "[o]ther than as stated in [FOF 105], the State does not hold an express easement over any portion of the Seawall that is the subject of these lawsuits."

dedication, "the time period must be 'much longer' than the twenty year prescriptive period under HRS § 657-31," relying on this court's decision in In re Banning, 73 Haw. 297, 832 P.2d 724 (1992). Proof of an offer of dedication was evidenced by "the long-continued public use of the Seawall as a walkway from the 1930s to the present." Acceptance of the offer of dedication was demonstrated both by the "uncontroverted direct evidence of public use of the Seawall as a walkway from at least 1952 to when [the] suit was filed" and the State's "assertion of dominion and control over the Seawall through the State's statements that the Seawall is a public right of way and the State's actions in repairing and rehabilitating the Seawall."

Additionally, the circuit court determined that in order to prevail under the surrender theory pursuant to HRS § 264-1(c) (2007), Gold Coast must prove, "at the very least," the following two elements: (1) "the Seawall is a thoroughfare that was opened, laid out, or built by private parties," and (2) "the owners have not exercised an act of ownership over the Seawall for five years or more."[13]

---

[13] The circuit court also addressed and rejected the State's argument that "formal acceptance by the State is required in order to transfer ownership by surrender," concluding that the plain language of the surrender statute did not support such a reading because "[i]f formal acceptance were required, the transfer would not be 'deemed' to have taken place" as set forth by the statute.

With respect to the first two elements of HRS § 264-1(c), the court concluded that the Seawall exists as a walkway running along the shoreline that was originally constructed by private parties; the court further determined that Gold Coast had established that the owners had not exercised an act of ownership over the Seawall for five years or more. The court recognized the possibility of a third requirement that the State hold a preexisting easement over the relevant property arising from this court's decision in In re Banning, 73 Haw. 297, 832 P.2d 724 (1992). The court concluded that this requirement, if applicable, would also be satisfied because the State held an express easement over TMK No. 3-1-033:009 and a prescriptive easement "over all the remaining parcels" with the exception of TMK Nos. 3-1-032:029 and 30 "where the Seawall is almost wholly within property registered in land court."[14] As a result, the court determined that Gold Coast proved that the Seawall "was surrendered to the State in accordance with HRS § 264-1(c)," with the exception of those portions of the Seawall located at TMK Nos. 3-1-032:029 and 3-1-032:030, which were properties registered in land court. See HRS § 501-87 (2006) (providing

_____

[14] Although the court concluded that the third element, that the State hold a preexisting easement over the relevant property, was satisfied in this case, it maintained in conclusion of law 11 that it was "not convinced" that this element was required to effectuate a surrender under HRS § 264-1(c).

that land registered in land court cannot be deemed to have been surrendered under the Hawaii Revised Statutes).

The circuit court issued its Final Judgment concluding that the State holds an easement by implied dedication over the Seawall including those portions of the Seawall at TMK Nos. 3-1-032:029 and 3-1-032:030. The Final Judgment additionally determined that the State owns the Seawall and the real property underneath the Seawall except as to those portions at TMK No. 3-1-032:029 and TMK No. 3-1-032:030 that are on privately owned land registered in land court. The State's complaint for declaratory judgment in Civil No. 10-1-10888-04 VLC was dismissed with prejudice. The Final Judgment set forth that each party "shall bear its/his/her own attorneys' fees and costs."

Gold Coast subsequently filed a motion for attorneys' fees and costs in the amount of $376,539.25 (Motion for Attorneys' Fees and Costs), asserting that the State's sovereign immunity was "not implicated" because the State had filed its own complaint against Gold Coast and that Gold Coast was entitled to fees under the private attorney general doctrine. Gold Coast also suggested that even if sovereign immunity barred an award of attorneys' fees, the "interest[s] of justice" would require the court to invoke its inherent authority under the Hawaii Revised Statutes to award Gold Coast the fees it sought.

18

Finally, Gold Coast contended that it was entitled to costs against the State pursuant to HRS § 607-24 (1993) because it received a final judgment against the State and was the prevailing party in the litigation. The State in its opposition argued that fees were barred by the State's sovereign immunity and that Gold Coast did not meet the requirements to merit a fee award under the private attorney general doctrine. The State alternatively contended that even if Gold Coast was entitled to fees, the requested amount must be substantially reduced. As to costs, the State argued that Gold Coast was not a prevailing party, and, in the alternative, that Gold Coast had provided "absolutely no detail as [to] any of their charges." On May 12, 2014, the circuit court entered an order denying Gold Coast's Motion for Attorneys' Fees and Costs (Order Denying Fees and Costs) because the State "ha[d] not waived its sovereign immunity as to an award of attorneys' fees and costs in the circumstances of this case."

## C. ICA Proceedings

The State appealed the circuit court's Findings of Fact and Conclusions of Law and the Final Judgment to the ICA. The State argued that the circuit court erred on the merits by ruling that the State acquired an easement over the Seawall by common law implied dedication and/or that it owned the Seawall

by virtue of surrender under HRS § 264-1(c).[15]  The State contended that "state law specifically prohibits the State from acquiring ownership of real property or any interest in real property without the State's acceptance," and because the State did not formally accept transfer of the Seawall, no implied dedication or surrender of the Seawall was effectuated.  In support of its argument, the State relied on HRS §§ 171-30 (1993), 26-7 (2009) (last amended 1990), 107-10 (Supp. 2001), and 520-7 (2006).[16]  The State additionally asserted that the evidence was insufficient to support a finding of common law implied dedication or statutory surrender.

Further, the State argued that the Seawall could not be surrendered to the State because it was not a "trail" or "public highway" within the meaning of HRS § 264-1, and, thus,

_____

[15]  The State also contended that the circuit court lacked jurisdiction, arguing that the declaratory judgment statute was inapplicable, that Gold Coast lacked standing, and that the action constituted an improper quiet title action to which Gold Coast was "not a proper party" and to which the "actual owners" of the properties were indispensable parties.  The ICA rejected the State's jurisdictional claims and determined that Gold Coast's complaint could not be treated as an action for quiet title.  Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 353, 361 P.3d 1243, 1256 (App. 2015).  The ICA did not rule on the State's argument regarding indispensable parties.  To the extent that the State repeats on certiorari its argument that the circuit court failed to join indispensable parties, this issue is addressed below.

[16]  Although the State raised arguments based on HRS §§ 171-30, 26-7, and 520-7 before the circuit court, it only raised HRS § 107-10 in support of its argument before the ICA by letter to the appellate clerk dated May 7, 2015, after submission of its Opening Brief.  Gold Coast filed a motion to strike the letter, which the ICA denied as moot following issuance of its opinion in the case.  On certiorari before this court, the State relies on the four statutes.

it was not a type of property subject to surrender under the statute.  The State distinguished this case from Levy v. Kimball, 50 Haw. 497, 443 P.2d 142 (1968), in which this court held that a particular seawall constituted a "public highway" within the meaning of HRS § 261-1, because unlike in Levy, the State had not acquired a preexisting express easement over the Seawall with the exception of TMK No. 3-1-033:009.

Gold Coast cross-appealed the circuit court's Order Denying Fees and Costs, contending that it was entitled to attorneys' fees under the private attorney general doctrine, that the State had waived its sovereign immunity because it had filed its own complaint against Gold Coast, and that the interests of justice required the court to award fees using its inherent authority.

On June 30, 2015, the ICA issued a published opinion affirming the circuit court's conclusion that the State had acquired an easement over the Seawall by common law implied dedication and the Seawall and real property under the Seawall by surrender.  Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 357, 361 P.3d 1243, 1260 (App. 2015).  Relying on In re Banning, 73 Haw. 297, 832 P.2d 724 (1992), the ICA held that both the owners' offer of dedication and the State's acceptance of that offer could be implied from the history of use and maintenance of the Seawall from "well before" 1969 to 2006.

21

Gold Coast Neighborhood Ass'n, 136 Hawai'i at 354, 361 P.3d at 1257. In support of its conclusion, the ICA relied on the evidence of the "public's open and continuous non-permissive use of the Seawall as a walkway from as early as 1956"; the ICA also cited "the State's recognition of the entire Seawall as a public walkway in 1975, 1982, 1984, 1992, and 2006" and "the State's repairs to portions of the Seawall in 1982, 1984, and 1993." Id. at 355, 361 P.3d at 1258. The ICA further noted that the parties "[did] not dispute" the circuit court's finding that the "public has used the Seawall for both shoreline and ocean access for decades and has done so without any apparent interference from any private landowners along the Gold Coast." Id. at 354-55, 361 P.3d at 1257-58. The ICA therefore determined that the circuit court did not err in concluding that the State held an easement over and across the Seawall by virtue of implied dedication. Id. at 355, 361 P.3d at 1258.

With respect to surrender, the ICA stated that a seawall that "is used as a public thoroughfare" may qualify as a "public trail" or "public highway" subject to surrender under HRS § 264-1. Id. (quoting Levy, 50 Haw. at 499-500, 443 P.2d at 144; HRS § 264-1(c) (2007)). The ICA observed that it was undisputed that the Seawall was "built by private parties and completed by 1930" and that "no owners of the Seawall exercised ownership over the Seawall for at least five years prior to

22

litigation." Id. As a result, the ICA concluded that the circuit court did not err in determining that the real property under the Seawall was surrendered to the State with the exception of those parcels registered in land court that were not subject to the surrender statute. Id. at 355-56, 361 P.3d at 1258-59.

The ICA also addressed the State's general argument that various provisions of the Hawaii Revised Statutes operate to preclude surrender or implied dedication of property to the State absent the State's formal consent. Id. at 356, 361 P.3d at 1259. Quoting from portions of HRS §§ 171-30 (1993), 26-7 (2009) (last amended 1990), and 107-10 (Supp. 2001), the ICA concluded that these provisions did not operate to require the State's formal consent because both doctrines of surrender and common law implied dedication "are well established means for the public to acquire State land without the State's consent via public use." Gold Coast Neighborhood Ass'n, 136 Hawai'i at 356, 361 P.3d at 1259. The ICA reasoned that the State's interpretation of HRS §§ 171-30, 26-7, and 107-10 "is not only inconsistent with the language of the statutes, but if adopted, would produce an absurd result in that it would silently abolish the doctrines of implied dedication and surrender." Id.

Lastly, the ICA addressed Gold Coast's appeal of the circuit court's denial of attorneys' fees and costs. Id. at

356-57, 361 P.3d at 1259-60.  On this issue, the ICA concluded that the circuit court had erred in barring attorneys' fees on the basis of the State's sovereign immunity because "'the doctrine of sovereign immunity is unavailing and inapposite' when the 'case deals with a suit initiated by the State.'"  Id. at 357, 361 P.3d at 1260 (alteration omitted) (quoting State ex rel. Anzai v. City & Cty. of Honolulu, 99 Hawai'i 508, 515-16, 57 P.3d 433, 440-41 (2002)).  The ICA also determined that the circuit court erred in denying Gold Coast costs, stating that "Gold Coast prevailed against the State" and citing HRS § 607-24 (1993).  Id.  Therefore, the ICA affirmed the circuit court's Findings of Fact and Conclusions of Law and Final Judgment, and it vacated the circuit court's Order Denying Fees and Costs and remanded for reconsideration of Gold Coast's Motion for Attorneys' Fees and Costs.  Id.

### III.    STANDARDS OF REVIEW

"The interpretation of a statute is a question of law reviewable de novo."  State v. Arceo, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting State v. Camara, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996)).  "Similarly, a trial court's conclusions of law are reviewable de novo under the right/wrong standard."  State v. Kelekolio, 94 Hawai'i 354, 356, 14 P.3d 364,

366 (App. 2000) (citing State v. Lopez, 78 Hawai'i 433, 440, 896 P.2d 889, 896 (1995)).

"The trial court's grant or denial of attorneys' fees and costs is reviewed under the abuse of discretion standard." Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 105, 176 P.3d 91, 104 (2008) (quoting Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007)).

## IV.    DISCUSSION

The State makes three principal arguments on certiorari. First, the State argues that HRS §§ 171-30, 26-7, and 107-10 operate to preclude common law implied dedication and surrender under HRS § 264-1(c) without the State's formal consent or acceptance. Second, the State contends that the circuit court was required to "make the actual owners of the real property parties to the case" and that its failure to do so constituted error. Third, the State submits that the ICA erred in determining that Gold Coast was entitled to attorneys' fees based on the ICA's reasoning that the filing of a complaint by the State for declaratory relief waived its sovereign immunity in this case.

## A.    Indispensable Parties

The State's argument on the issue of indispensable parties contends that "the actual property owners" must be joined to a lawsuit that determines ownership of the owners' properties.  Gold Coast responds that it need not join the individual owners of the properties at issue because their interests are sufficiently represented by the various apartment owners' associations that are members of Gold Coast, the named plaintiff in this case.

Gold Coast's Second Amended Complaint sought a declaration that the State is responsible for maintaining the Seawall bordering eleven identified properties that are managed by various entities.  See supra notes 1, 5.  Each of these entities is a member of plaintiff Gold Coast Neighborhood Association and joined Gold Coast for the purpose of having it represent the entity's and owners' interests in this litigation.

The State acknowledged before the circuit court that the individual owners of properties located on the eleven parcels at issue in this litigation could have "their rights in this matter" "protect[ed] or represent[ed]" by "their respective condominium associations" thereby obviating any requirement to join the individual owners, but submitted that such representation was only permitted by a provision of the Hawaii Revised Statutes that was repealed in 2004 by Act 164 of the

26

Hawai'i State Legislature.  See HRS § 514A-93 (1993) ("actions may be brought by the manager or board of directors, in either case in the discretion of the board of directors on behalf of two or more of the apartment owners . . . with respect to any cause of action relating to the common elements or more than one apartment"), repealed by 2004 Hawai'i Session Laws Act 164, § 26 at 813.  However, although HRS § 514A-93 (1993) was repealed by Act 164 prior to commencement of proceedings in this case, the act retained and relocated within the Hawaii Revised Statutes the authority of apartment and condominium associations to represent the interests of their owners in litigation.  See 2004 Hawai'i Session Laws Act 164, § 2 at 761-62 (codified at HRS § 514B-104(a)(4) (2006)).  Further, although HRS § 514A-93 (1993) was repealed in 2004, language identical to the prior version of HRS § 514A-93 was reenacted at HRS § 514A-93 in 2007 and made retroactively effective to July 1, 2006.  See HRS § 514A-93 (Supp. 2007); 2007 Hawai'i Session Laws Act 244, § 2 at 745.  Thus, at the time Gold Coast initiated this litigation on June 22, 2007, its members were statutorily entitled to "[i]nstitute, defend, or intervene in litigation" on behalf of their respective owners.  HRS § 514B-104(a)(4) (2006); see also HRS § 514A-93 (Supp. 2007) (permitting the manager or board of directors to bring actions on behalf of owners).  The circuit

court therefore did not err in concluding that Gold Coast need not join the individual owners as indispensable parties.[17]

### B.     Common Law Implied Dedication

Next, the State contends that various disparate provisions of the Hawaii Revised Statutes operate to condition the implied dedication of private property to the State upon the State's formal consent or acceptance.  Gold Coast responds that the statutes relied upon by the State do not require the State's formal acceptance as an additional element to the common law doctrine of implied dedication that has long existed in the State of Hawai'i.

In 1892, Queen Lili'uokalani and the Kingdom of Hawai'i adopted the common law of England as the basis of its jurisprudence by legislation entitled "Act to Reorganize the Judiciary Department."  See L. 1892, ch. 57, § 5; see also Damien P. Horigan, On the Reception of the Common Law in the Hawaiian Islands, III, 13 Haw. Bar. J. 87, 111-12 (1999).  The present-day codification of this legislation can be found at HRS § 1-1, which provides in relevant part as follows:

---

[17]     The individuals or entities named as parties by the State's complaint that were not included in Gold Coast's subsequent Second Amended Complaint filed answers responding specifically to the State's complaint. Each of these individuals or entities asserted that the State was responsible for maintaining the Seawall and raised as a defense to the State's complaint "the public's consistent and extensive use of the seawalls" for "at least 50 to 100 years."

> The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage . . . .

HRS § 1-1 (2009) (emphasis added). Thus, the common law of England applies in the State of Hawaiʻi except as otherwise expressly provided by Hawaiʻi law, federal law, or by Hawaiian judicial precedent or usage.

The common law has historically provided for the dedication of private property for public use.[18] In re Banning, 73 Haw. 297, 304-05, 832 P.2d 724, 728-29 (1992). Common law dedication of private property is "accomplished either expressly, as by deed, or impliedly, as by acts and conduct which manifest an intent to give the property for public use." Maui Ranch Estates Owners Ass'n v. Maui Cty., 6 Haw. App. 414, 421, 724 P.2d 118, 123 (1986) (citing City of Kechi v. Decker, 230 Kan. 315, 634 P.2d 1099 (1981); 23 Am. Jur. 2d Dedication § 3 (1983)); see also Banning, 73 Haw. at 304, 832 P.2d at 728-29 ("A common law dedication may be accomplished without any statement, written or spoken, for one who invites or merely permits the public to use his or her land for a long period may

_____

[18]    Private property may also be dedicated for public use by statute, which occurs when "the statutory provisions" relating to dedication are "complied with." Maui Ranch Estates Owners Ass'n v. Maui Cty., 6 Haw. App. 414, 421, 724 P.2d 118, 123 (1986).

be held to have made an offer of implied dedication." (quoting R.A. Cunningham, The Law of Property 751 (1984))). "A common law dedication does not operate as a grant but as an equitable estoppel," 23 Am. Jur. 2d Dedication § 54 (2013), whereby "the owner is estopped to deny permanent public access" because the owner has "admitted the public to use the land over a long time." Banning, 73 Haw. at 304, 832 P.2d at 729 (quoting R.A. Cunningham, The Law of Property 751 (1984)); see also 23 Am. Jur. 2d Dedication § 54 (common law dedication is applied "because of lack of a grantee capable of taking").

Under the common law, formal acceptance is not required to effectuate an implied dedication.[19] Indeed, in its explicit adoption of common law implied dedication in 1869, the Supreme Court of the Kingdom of Hawai'i in The King v. Cornwell, 3 Haw. 154, 161 (Haw. Kingdom 1869), considered that acceptance could be inferred from public use. The Cornwell court established that in Hawai'i, "[o]rdinarily, there is no other

---

[19] See Vitauts M. Gulbis, Implied acceptance, by public use, of dedication of beach or shoreline adjoining public waters, 24 A.L.R.4th 294 (1983) ("Under generally accepted common-law principles, the implied acceptance of an implied or express offer to dedicate, can be shown by maintenance or improvement of the property by local government activity or by use by members of the unorganized public." (footnotes omitted)); 26 C.J.S. Dedication § 2 (2011) (a common-law dedication requires "the implied acceptance of the use of property" or, alternatively, "the express acceptance of the municipality"); Steve A. McKeon, Public Access to Beaches, 22 Stan. L. Rev. 564, 573 (1970) (common law implied dedication requires "[n]o formalities" and "public use itself may be taken as evidence of acceptance").

mode of showing an acceptance by the public of a dedication than by its being made use of by them," but considered that if public use was the only evidence of dedication, it must have continued for a longer period than that required to effectuate a prescriptive easement.  Id. at 161-62.

Following Cornwell, our courts have continued to recognize common law implied dedication as a method of transferring interests in property to the State and have repeatedly noted that formal acceptance is not a prerequisite. See, e.g., Maui Ranch, 6 Haw. App. at 421, 724 P.2d at 123 (common law dedication may be accomplished "impliedly, as by acts and conduct which manifest an intent to give the property for public use"); Banning, 73 Haw. at 304-05, 832 P.2d at 728-29 ("[T]he acceptance may also be implied by the nature of the public use . . . . In other words, the duration and type of public use can raise both the presumption of the owner's intent (or offer) to dedicate land to public use, as well as constitute acceptance by the public." (citations omitted)); Wemple ex rel. Dang v. Dahman (Wemple II), 103 Hawai'i 385, 397, 83 P.3d 100, 112 (2004) (although the county had not formally accepted a statutory dedication, an additional significant question remained regarding whether "the public had an easement over [a] privately owned road because the road had been impliedly dedicated to the public"); City & Cty. of Honolulu v. Boulevard

Props., Inc., 55 Haw. 305, 306, 517 P.2d 779, 781 (1973) (implied dedication of streets for use by the public may occur when land is subdivided into lots and streets, a plat showing such subdivision is recorded, and sales of the lots are made); see also David M. Forman & Susan K. Serrano, Traditional and Customary Access and Gathering Rights, in Native Hawaiian Law - A Treatise 779, 818 (Melody Kapilialoha MacKenzie et al. eds., 2015) (observing that "[a]ccess along Hawaiian trails may be protected where there has been an implied dedication of a public right-of-way across private land" and analyzing Cornwell, 3 Haw. 154). Though continuous use of the property by members of the public is commonly relied upon in determining whether a dedication occurred, conduct evincing an implied acceptance may also include actions attributable to the government, such as "maintenance of sidewalks, beach patrols, or the installation of utility connections by local government bodies." See Gulbis, supra note 19 (stating that such conduct "has been held to support an implied acceptance of an express offer to dedicate").

Despite its deeply entrenched and long historical presence in our jurisprudence, the State contends that various provisions of the Hawaii Revised Statutes operate to preclude the implied dedication of private property to the State without the State's explicit acceptance. The State therefore suggests that the doctrine of common law implied dedication has been

implicitly abolished in Hawai'i, insofar as it contends that an implied acceptance of an offer of dedication is insufficient to deem private property dedicated to the public.  See Banning, 73 Haw. at 304, 832 P.2d at 728-29.  However, statutes which abrogate the common law must do so expressly, not impliedly, and such statutes "must be strictly construed."  Burns Int'l Sec. Servs., Inc. v. Dep't of Transp., 66 Haw. 607, 611, 671 P.2d 446, 449 (1983).  Additionally, review of the statutory provisions cited by the State and the relevant caselaw refute the State's contention that Hawaii's common law doctrine of implied dedication may not transfer interests in private property to the State absent the State's formal consent.

### i.    Abrogation of common law disfavored

HRS § 1-1 provides that the only exception to the general applicability of common law principles in this jurisdiction occurs when state or federal law "expressly provide[s]" otherwise.  See HRS § 1-1 (2009) (emphasis added).  Our courts have repeatedly recognized the importance of the common law and have demonstrated an unwillingness to impliedly reject its principles; they have also determined that subsequent statutory enactments will not be construed as abrogating the common law "unless that result is imperatively required."  Minneapolis Fire & Marine Ins. v. Matson Nav. Co., 44 Haw. 59, 67-68, 352 P.2d 335, 340 (1960) (emphasis added) (quoting

33

Gabriel v. Margah, 37 Haw. 571, 580 (Haw. Terr. 1947)); E. Star, Inc., S.A. v. Union Bldg. Materials Corp., 6 Haw. App. 125, 141, 712 P.2d 1148, 1159 (1985) (same). This court has also held that "statutes which are in derogation of common law must be strictly construed," and we have refused to reject common law rules absent a finding of "express [legislative] intent." Burns Int'l Sec. Servs., Inc. v. Dep't of Transp., 66 Haw. 607, 611, 671 P.2d 446, 449 (1983) (declining to abrogate common law principle of non-transferability of licenses because, in part, there was no "express intent that the legislature had forsaken the common law rule").

This strong reluctance to abolish common law rights and remedies absent a finding of express legislative intent is not unique to Hawai'i and has, in fact, been expressed by the United States Supreme Court and the courts of numerous state and federal jurisdictions. See, e.g., United States v. Texas, 507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law," in part, because the legislature has "not [written] upon a clean slate." (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978))); Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except

34

when a statutory purpose to the contrary is evident."); Globe & Rutgers Fire Ins. v. Draper, 66 F.2d 985, 991 (9th Cir. 1933) ("The courts are reluctant to construe statutes in derogation of the common law."); Gallegos v. Lyng, 891 F.2d 788, 798 (10th Cir. 1989) ("implied repeals of the common law are disfavored and should be found only where such a statutory purpose is evident"); Pac. Ins. v. Champion Steel, LLC, 323 Conn. 254, 264, 146 A.3d 975, 982 (Conn. 2016) ("It is fundamental that if the legislature wishes to abrogate the common law, it must do so expressly."); Cal. Ass'n of Health Facilities v. Dep't of Health Servs., 940 P.2d 323, 331 (Cal. 1997) ("As a general rule, 'unless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.'" (alteration omitted) (quoting Goodman v. Zimmerman, 32 Cal. Rptr. 2d 419, 424 (Cal. Ct. App. 1994))).

**ii.  Hawaii Revised Statutes do not reflect express legislative intent to abrogate the common law**

The Hawaii Revised Statutes, and in particular, HRS §§ 264-1(c)(1), 171-30, 26-7, 107-10, and 520-7, do not "imperatively require" abrogation of common law implied dedication, nor do they evince an express legislative intent to do so.  Minneapolis Fire & Marine Ins. v. Matson Nav. Co., 44 Haw. 59, 67-68, 352 P.2d 335, 340 (1960); Burns Int'l Sec.

Servs., Inc. v. Dep't of Transp., 66 Haw. 607, 611, 671 P.2d 446, 449 (1983).

### a.    HRS § 264-1(c)(1)

Although not expressly relied upon by the State, the dissent contends that HRS § 264-1(c)(1) abrogates common law dedication with respect to ways and trails.  Dissent at 20.  We therefore begin our analysis by considering the analogous concepts of statutory dedication as set forth in the Hawaii Revised Statutes and common law implied dedication and the treatment of the two doctrines by courts of this jurisdiction.

HRS § 264-1(c)(1) sets forth the requirements to effectuate a statutory dedication of certain private lands for public use in the State of Hawai'i.  At the commencement of this litigation, HRS § 264-1(c)(1) provided in relevant part:

> (c) All roads, alleys, streets, ways, lanes, trails, bikeways, and bridges in the State, opened, laid out, or built by private parties and dedicated or surrendered to the public use, are declared to be public highways or public trails as follows:
>
> > (1) Dedication of public highways or trails shall be by deed of conveyance naming the State as grantee in the case of a state highway or trail and naming the county as grantee in the case of a county highway or trail.  The deed of conveyance shall be delivered to and accepted by the director of transportation in the case of a state highway or the board of land and natural resources in the case of a state trail.  In the case of a county highway or county trail, the deed shall be delivered to and accepted by the legislative body of a county.

HRS § 264-1(c)(1) (2007).  HRS § 264-1(c)(1) constitutes a method of executing a dedication by statute ("statutory

36

dedication") because it delineates procedures to effect "a dedication of land to public use . . . pursuant to statute."  23 Am. Jur. 2d Dedication § 3 (2013); see also Maui Ranch Estates Owners Ass'n v. Maui Cty., 6 Haw. App. 414, 421, 724 P.2d 118, 123 (1986) ("Dedication of land for public use may be achieved either by statute or by common law.  Statutory dedication occurs when the statutory provisions are complied with.").

Although the Hawaii Revised Statutes provide for a method of statutory dedication, HRS § 264-1(c)(1) does not provide an exclusive method of dedicating private property for public use in the State of Hawai'i.  Rather, HRS § 264-1(c)(1) exists alongside common law implied dedication, which our courts have long recognized.  See, e.g., The King v. Cornwell, 3 Haw. 154, 155, 161-62 (Haw. Kingdom 1869); Maui Ranch, 6 Haw. App. at 421, 724 P.2d at 123; In re Banning, 73 Haw. 297, 304-05, 832 P.2d 724, 728-29 (1992); Wemple II, 103 Hawai'i 385, 397, 83 P.3d 100, 112 (2004); Wemple ex rel. Dang v. Dahman (Wemple I), 102 Hawai'i 27, 72 P.3d 499 (App. 2002), rev'd, 103 Hawai'i 385, 83 P.3d 100 (2004).  Indeed, decisions of this jurisdiction analyzing HRS § 264-1(c) have also simultaneously reaffirmed the viability of common law implied dedication as a way of transferring property interests to the State in addition to the method of statutory dedication codified in the Hawaii Revised Statutes.  See Wemple II, 103 Hawai'i at 392-93, 397, 83 P.3d at

107-08, 112 (concluding that although the road was not dedicated to the county by virtue of HRS § 264-1 (Supp. 1990), it remained a "significant" question whether the public held an easement over the road by operation of common law implied dedication); Banning, 73 Haw. at 304-05, 313, 832 P.2d at 728-29, 732 (detailing doctrine and requirements of common law dedication and then separately analyzing HRS § 264-1 (1985)); Maui Ranch, 6 Haw. App. at 421-22, 724 P.2d at 123-24 (same). The coexistence of common law dedication and statutory dedication in our state exemplifies the principle that "[e]ven in the same jurisdiction, a dedication of land to public use may be made either according to the common law or pursuant to statute." 23 Am. Jur. 2d Dedication § 3 (2013).

For example, in Wemple II, this court was called upon to review a grant of summary judgment determining that a private roadway had been dedicated to a county for public use. 103 Hawaiʻi at 392-93, 83 P.3d at 107-08. The court noted that the ICA in its published opinion in the case[20] had already "thoroughly analyzed the complex history of the public road system in Hawaiʻi" and had correctly concluded that HRS § 264-1 "prevents a private road from becoming a 'county highway' . . .

_____

[20]     See Wemple I, 102 Hawaiʻi 27, 72 P.3d 499, rev'd, 103 Hawaiʻi 385, 83 P.3d 100.

without express acceptance of the private road by the County Council," which had not occurred.  Id.

Significantly, the Wemple II court in its unanimous opinion explicitly recognized the continued viability of common law implied dedication in Hawai'i.  In addition to determining that the private roadway had not been dedicated to the county by virtue of HRS § 264-1, this court also analyzed the ICA's "conclu[sion] as a matter of law" that "the public had an easement over the privately owned road because [the] road had been impliedly dedicated to the public."  Id. at 397, 83 P.3d at 112.  We concluded that the ICA had erred in resolving the issue of implied dedication as a matter of law.  Id.  As stated by the Wemple II court, "Whether an implied easement exists depends on the parties' intent and is therefore a question of fact."  Id. Based on the record, we concluded that there remained questions of fact regarding the parties' intents, thus making summary judgment inappropriate.  Id.  As a result, this court reversed the ICA's decision, vacated the trial court's grant of summary judgment, and remanded to the trial court for further proceedings.  Id. at 398, 83 P.3d at 113.[21]

---

[21]    The dissent characterizes Wemple II as a "refus[al] to apply the theory of implied dedication to transfer a privately owned road to the county as a county highway."  Dissent at 24.  However, as discussed, this court in Wemple II specifically acknowledged the viability of common law implied dedication; indeed, we remanded to the trial court based in part on our

(continued. . .)

39

Wemple I and Wemple II reflect our historical application of common law implied dedication as an alternative means of transferring interests to the State separate and apart from HRS § 264-1(c)(1). Indeed, Wemple II manifested its approval of the ICA's following summary in Wemple I on the viability of common law implied dedication and its interplay with statutory dedication:

> To summarize, HRS § 264-1 requires that before a county can be held responsible and liable for the maintenance or repair of a private road that has been dedicated, surrendered, or abandoned to public use, there must have been "unequivocal acceptance" of the private road by the legislative body of the county. Maui Ranch Estates Owners Ass'n v. County of Maui, 6 Haw.App. at 421, 724 P.2d at 123. That is, all the requirements for statutory dedication, abandonment, or surrender must be completed. However, a privately owned road that has not been statutorily dedicated, surrendered, or abandoned to public use by technical compliance with HRS § 264-1 may still be impliedly dedicated, surrendered, or abandoned to public use for a general roadway easement.

Wemple I, 102 Hawai'i at 53, 72 P.3d at 525 (emphasis added).[22]

Therefore, for the reasons stated, and because this court has firmly recognized that the two doctrines exist in

---

(. . .continued)

conclusion that "[w]hether an implied easement exists" was a question to be determined based on the "parties' intent[s]." 103 Hawai'i at 397, 83 P.3d at 112.

[22] This court in Wemple II described with approval the ICA's "thorough[] analy[sis] [of] the complex history of the public road system in Hawai'i," which concluded with the text quoted above. 103 Hawai'i at 392, 83 P.3d at 107; see also Wemple I, 102 Hawai'i at 47-53, 72 P.3d at 519-25. Thus, to the extent that it was approved of by this court in Wemple II, the ICA's summary from Wemple I may inform our understanding of the doctrine of implied dedication.

harmony, see Wemple II, 103 Hawai'i at 397, 83 P.3d at 112,[23] HRS § 264-1(c)(1) evinces no intent to abrogate the concept of common law dedication, much less does it "imperatively require[]" such result. Burns Int'l Sec. Servs., Inc., 66 Haw. at 611, 671 P.2d at 449; Minneapolis Fire & Marine Ins., 44 Haw. at 67-68, 352 P.2d at 340.

### b.   HRS §§ 171-30, 26-7, 107-10

In support of its contention that the common law doctrine of implied dedication may not transfer interests in private property to the public without the State's explicit acceptance, the State primarily relies on HRS §§ 171-30 (1993), 26-7 (2009) (last amended 1990), and 107-10 (Supp. 2001). However, a clear intent to abrogate common law implied dedication in this jurisdiction is absent in these provisions.

---

[23]   Although predating both this court's decisions in Banning and Wemple II, the State and the dissent suggest that the ICA's 1986 decision in Maui Ranch, 6 Haw. App. 414, 724 P.2d 118, indicates that private land may only be dedicated to the State by statutory dedication as codified at HRS § 264-1(c)(1). In Maui Ranch, however, the ICA clearly stated that "[d]edication of land for public use may be achieved either by statute or by common law." 6 Haw. App at 421, 724 P.2d at 123 (emphasis added); see also id. (dedication may occur "[i]n the absence of statute" (quoting 23 Am. Jur. 2d Dedication § 45)). The ICA also acknowledged that common law dedication may be accomplished "impliedly, as by acts and conduct which manifest an intent to give the property for public use." Id. (citations omitted). The ICA thus clearly manifested its approval of the common law doctrine of implied dedication, see id., which was subsequently reaffirmed by this court in Banning, 73 Haw. 297, 832 P.2d 724, and Wemple II, 103 Hawai'i 385, 83 P.3d 100.

HRS § 171-30 grants authority to the Board of Land and Natural Resources (BLNR) to acquire interests in "all real property" and provides in relevant part as follows:

> (a) The board of land and natural resources shall have the exclusive responsibility, except as provided herein, of acquiring, including by way of dedications:
>
> > (1) All real property or any interest therein and the improvements thereon, if any, required by the State for public purposes . . . .

HRS § 171-30(a)(1) (1993). BLNR thus has the exclusive responsibility of "acquiring" real property that the State needs for public purposes, including by dedication. HRS § 171-30(a)(1). Although BLNR is assigned responsibility to affirmatively acquire property by way of purchase or statutory dedication, the statute does not address obtaining the State's formal approval or acceptance of dedicated property in all cases, particularly when it is merely a passive recipient.[24] Indeed, this statute has been in effect for more than 50 years and no case in this jurisdiction has considered it relevant within the context of common law implied dedication, much less has it been interpreted to abrogate or modify the doctrine of

---

[24] Additionally, HRS § 171-30(a)(1) may simply function to identify the state entity administratively responsible for acting and initiating a transaction when the State requires the acquisition of real property for public use. See Island-Gentry Joint Venture v. State, 57 Haw. 259, 263-64, 554 P.2d 761, 764-65 (1976) (authority of BLNR to "acquir[e]" real property under HRS § 171-30 also signifies that BLNR is the entity responsible for "initially enter[ing] into a contract for the acquisition of land" when required for public use).

implied dedication.  See, e.g., Banning, 73 Haw. at 304-09, 832 P.2d at 728-31; Wemple II, 103 Hawai'i at 397, 83 P.3d at 112; Maui Ranch, 6 Haw. App. at 420-22, 724 P.2d at 123-24.  In light of these considerations, HRS § 171-30 neither manifests an express intent to abrogate common law implied dedication nor imperatively requires such result.  See Burns Int'l Sec. Servs., Inc., 66 Haw. at 611, 671 P.2d at 449; Minneapolis Fire & Marine Ins., 44 Haw. at 67-68, 352 P.2d at 340.

HRS §§ 26-7 and 107-10 likewise do not evince a clear intent to abrogate or modify common law implied dedication.  HRS § 26-7 establishes the composition and authority of the Department of the Attorney General.  The provision delineates the various powers and duties of that office and provides that the Attorney General "shall . . . approve as to legality and form all documents relating to the acquisition of any land or interest in lands by the State."  HRS § 26-7 (2009) (last amended 1990) (emphasis added).  HRS § 107-10 similarly requires that no real property interest "shall be acquired" by the State "by agreement, gift, devise, eminent domain, or otherwise . . . without the prior approval of the attorney general as to form, exceptions, and reservations."  HRS § 107-10 (Supp. 2001) (emphasis added).  These provisions do not relate or speak to conveyance of property interests by way of implied dedication. Rather, HRS §§ 26-7 and 107-10 merely give the Attorney General

final authority to review and approve the documents relating to
acquisitions of land interests and to inspect such acquisitions
as to form, exceptions, and reservations.  See HRS §§ 26-7, 107-
10; see also Island-Gentry Joint Venture v. State, 57 Haw. 259,
265, 554 P.2d 761, 766 (1976) (noting that under HRS § 26-7,
"the Attorney General has the further exclusive authority to
approve as to the legality and form of all documents relating to
the acquisition of any land or interest in land by the State").
These provisions express no intent to abrogate common law
implied dedication, nor have they ever been mentioned by our
courts as having any relevance to the doctrine.  See Burns Int'l
Sec. Servs., Inc., 66 Haw. at 611, 671 P.2d at 449.

### c.    HRS chapter 520

The State also argued before the circuit court that
HRS chapter 520 operated to preclude the implied dedication of
the Seawall for public use in this case.  However, HRS chapter
520, titled "Landowners' Liability," does not demonstrate an
express intent to abrogate implied dedication as a method of
transferring interests in private property to the State.
Rather, "[t]he purpose of this chapter is to encourage owners of
land to make land and water areas available to the public for
recreational purposes by limiting their liability toward persons
entering thereon for such purposes."  HRS § 520-1 (2006).  To
accomplish this purpose, HRS chapter 520 shields from liability

private property owners who allow the public to use their land for recreational purposes. See HRS § 520-4 (2006).

Additionally, to further protect private property owners, HRS § 520-7 provides that "[n]o person shall gain any rights to any land by prescription or otherwise, as a result of any usage thereof for recreational purposes as provided in this chapter." HRS § 520-7 (2006) (emphasis added). HRS chapter 520 thus also concerns itself with the property rights of private landowners as they relate to the recreational user, seeking to balance public recreational use and private property rights in order to incentivize permissive public use of private land. HRS chapter 520 does not, however, speak to the rights or responsibilities of the State in relation to the private property owner.

Since its enactment in 1969, HRS chapter 520 has never been interpreted to suggest an abrogation of common law implied dedication. To the contrary, this court has expressly considered the effect of HRS chapter 520 on implied dedication and has found the two to be reconcilable. See Banning, 73 Haw. at 305-08, 832 P.2d at 729-30. In Banning, this court considered whether continuous public use of private property raises a conclusive presumption that the landowner intended to offer the property for dedication. Id. The Banning court noted that the general intent of HRS chapter 520 to encourage

landowners to permit public use of private lands could be undermined by such a conclusive presumption. Id. at 307-08, 832 P.2d at 730. In keeping with this intent, the court determined that continuous public use raises only a rebuttable presumption of implied dedication, thus concluding that the common law doctrine of implied dedication and HRS chapter 520 exist in harmony. Id. at 308, 832 P.2d at 730. Therefore, HRS chapter 520 has already been determined by this court to not evince an express intent to abolish common law implied dedication or to imperatively require that result. See Burns Int'l Sec. Servs., Inc., 66 Haw. at 611, 671 P.2d at 449; Minneapolis Fire & Marine Ins., 44 Haw. at 67-68, 352 P.2d at 340.

### d. Implicit abolishment of common law implied dedication is improper

The State contends that the foregoing statutes require both the Attorney General and the BLNR to formally consent to all transfers of real property interests to the State. The State thus asserts that implied acceptance is insufficient to effectuate an implied dedication of property to the State. This conclusion, which abrogates the common law doctrine of implied dedication as a means of transferring interests in private property to the public, is not supported by the authority cited by the State. First, the common law doctrine of implied dedication has been repeatedly recognized in this jurisdiction

for over 150 years, and this court itself has reaffirmed its viability as recently as 2004.  See Cornwell, 3 Haw. at 161-62 (recognizing common law implied dedication and observing that "[o]rdinarily, there is no other mode of showing an acceptance by the public of a dedication than by its being made use of by them"); Maui Ranch, 6 Haw. App. at 421, 724 P.2d at 123 (common law dedication may be accomplished "impliedly, as by acts and conduct which manifest an intent to give the property for public use"); Banning, 73 Haw. at 304-05, 832 P.2d at 728-29 ("[T]he acceptance may also be implied by the nature of the public use . . . . In other words, the duration and type of public use can raise both the presumption of the owner's intent (or offer) to dedicate land to public use, as well as constitute acceptance by the public." (citations omitted)); Wemple II, 103 Hawai'i at 397, 83 P.3d at 112 (although the county had not formally accepted a statutory dedication, an additional significant question remained regarding whether "the public had an easement over [a] privately owned road because the road had been impliedly dedicated to the public");[25] City & Cty. of Honolulu v. Boulevard Props., Inc., 55 Haw. 305, 306, 517 P.2d 779, 781 (1973) (implied dedication of streets for use by the public may occur

---

[25]    Significantly, the proceedings in this case commenced only three years after this court affirmed the common law principle of implied dedication in Wemple II, 103 Hawai'i at 397, 83 P.3d at 112.

when land is subdivided into lots and streets, a plat showing

such subdivision is recorded, and sales of the lots are made).[26]

Abrogation of such a deeply-rooted principle of law is

contradictory to our jurisdiction's requirement that the common

law governs unless "otherwise expressly provided."[27]  HRS § 1-1

(2009) (emphasis added); Minneapolis Fire & Marine Ins., 44 Haw.

at 67-68, 352 P.2d at 340 (subsequent statutory enactments will

not be construed as abrogating the common law "unless that

result is imperatively required").  Indeed, the fact that HRS §

1-1 requires adherence to the common law unless "otherwise

---

[26]     The dissent agrees that Cornwell, 3 Haw. 154, "contemplate[s]
implied dedication of Kingdom highways," but asserts that this case was
superseded by The Highways Act in 1892.  Dissent at 22 n.6.  However, our
courts have repeatedly--over the course of the past century and as recently
as 2004--acknowledged the vitality of common law implied dedication as a
method of transferring property interests to the State.  See supra.

         The dissent, however, characterizes this body of caselaw as
"sporadic and disparate," relating only "peripherally . . . to the issue at
hand," dissent at 19, which should be disregarded because despite repeatedly
affirming the doctrine, our courts "have not applied implied dedication to
public highways," dissent at 21.  As an initial matter, the dissent describes
as one of the "question[s] raised by this case" "whether private property
rights may be dedicated . . . to the State without the State's formal
consent."  Dissent at 6.  Because this body of caselaw speaks directly to
whether private property can be impliedly dedicated to the State in the
absence of its formal or express acceptance, it does, in fact, relate
precisely "to the issue at hand."  Additionally, the viability of common law
implied dedication is not dependent on whether the facts in these cases may
or may not have established an implied dedication; rather, our courts have
repeatedly concluded that under the appropriate circumstances, private
property may be impliedly dedicated to the State absent its formal
acceptance.  See Cornwell, 3 Haw. at 161-62; Maui Ranch, 6 Haw. App. at 421,
724 P.2d at 123; Banning, 73 Haw. at 304-05, 832 P.2d at 728-29; Wemple II,
103 Hawai'i at 397, 83 P.3d at 112.

[27]     The ICA similarly concluded that the State's argument, if
adopted, "would produce an absurd result in that it would silently abolish
the doctrines of implied dedication and surrender."  Gold Coast Neighborhood
Ass'n v. State, 136 Hawai'i 340, 356, 361 P.3d 1243, 1259 (App. 2015).

expressly provided" suggests that impliedly abolishing the common law is itself inconsistent with HRS § 1-1.

Further, that the State is required to rely on a combination of disparate provisions of the Hawaii Revised Statutes exposes an important point: none of the provisions relied upon provide for the abrogation of Hawaii's common law doctrine of implied dedication or evince express legislative intent to do so. Even combined, the statutes cited by the State do not support an implicit abolishment of common law implied dedication. Decisions of this court that have considered two of the provisions relevant to this case repudiate any argument that they operate to impliedly abrogate the doctrine. See Wemple II, 103 Hawai'i at 397, 83 P.3d at 112 (considering as a "significant" question whether an easement was created over a roadway by virtue of implied dedication even after finding a lack of compliance with HRS § 264-1 (Supp. 1990)); Banning, 73 Haw. at 307-08, 832 P.2d at 730 (concluding that in light of legislative intent behind HRS chapter 520, public use constituted a rebuttable presumption of implied dedication). The remaining provisions relied on by the State have been codified in the Hawaii Revised Statutes for decades, and no case has ever cited to them as relevant to or inconsistent with the doctrine.

Permitting the implied repeal of a common law doctrine that has been recognized by this court as recently as 2004[28] would permit the implied abrogation of the common law in other areas of our jurisprudence, in direct contradiction to the mandate of HRS § 1-1 that the common law governs unless "otherwise expressly provided."  HRS § 1-1.  As stated by this court, "statutes which are in derogation of common law must be strictly construed."  Burns Int'l Sec. Servs., Inc., 66 Haw. at 611, 671 P.2d at 449 (emphasis added); see also Akai v. Lewis, 37 Haw. 374, 378 (Haw. Terr. 1946) ("It is also well settled that under the rule of strict construction it is not to be presumed that the lawmakers intended to abrogate or modify a rule any further than that which is expressly declared or clearly indicated."); Pac. Ins. v. Champion Steel, LLC, 323 Conn. 254, 264 (Conn. 2016) ("It is fundamental that if the legislature wishes to abrogate the common law, it must do so expressly.").

Additionally, in Banning, this court stated that "public policy 'favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible.'"  Banning, 73 Haw. at 309–10, 832 P.2d at 731 (quoting Cty. of Haw. v. Sotomura, 55 Haw. 176, 182, 517 P.2d 57, 61-62 (1973)).

---

[28]    See Wemple II, 103 Hawaiʻi at 397, 83 P.3d at 112.

The Banning court specified that this public policy interest "must be balanced against the littoral landowner's right to the enjoyment of his land." Id. at 310, 832 P.2d at 731. As concluded by the circuit court, "the Seawall is critical to public access to the shoreline along the Gold Coast." It is further noted that in this case, Gold Coast's littoral landowners acknowledge the State's easement interest over and across the Seawall.

Impliedly abrogating the doctrine of implied dedication would also in cases such as this conflict with our court's strong historical commitment to preserving public access to the ocean by vesting rights in waterways and beaches in the State when reasonably possible. See, e.g., In re Ashford, 50 Haw. 314, 440 P.2d 76 (1968) (holding that the boundary of the State's ownership of public beaches extended to upper reaches of wash of waves, rather than the mean high tide line); Sotomura, 55 Haw. at 181-82, 517 P.2d at 61-62 (describing Ashford as a judicial recognition that the "long-standing public use of Hawaii's beaches . . . has ripened into a customary right" and noting that public policy "favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible"); State v. Zimring, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977) (new ocean shoreline formed by volcanic eruption belonged to the public rather than private property owners,

because "sound public policy demand[s] that such land inure to the benefit of all the people of Hawaii"); Diamond v. State, 112 Hawaiʻi 161, 175-76, 145 P.3d 704, 718-19 (2006) (artificially planted vegetation could not be used to determine shoreline because it would encourage private landowners to plant vegetation to extend their property onto the beach and would thus be contrary to public policy of extending public ownership and use of beaches).

Thus, neither the Hawaii Revised Statutes nor Hawaiʻi caselaw expressly or imperatively requires the implied abolishment of our deeply-rooted common law doctrine of implied dedication.

### iii.   The State has an easement over and across the Seawall by virtue of implied dedication

The circuit court in this case concluded that the State acquired "an easement over and across the Seawall by implied dedication."  The circuit court based this conclusion on two determinations.  First, the court found that there was "uncontroverted direct evidence of public use of the Seawall as a walkway from at least 1952 to when [the] suit was filed."  Second, the evidence demonstrated that the State asserted dominion and control over the Seawall through its statements that the "Seawall is a public right of way" and its actions in repairing and rehabilitating the Seawall.  The ICA, upon

reviewing the record, likewise determined that an implied dedication of the Seawall had occurred: "(1) the owners of the Seawall made an offer of dedication as early as 1956, and (2) the State accepted the owners' offer through the public's use of the Seawall since at least 1956, the State's recognition of the Seawall as a public walkway since 1960, and the State's repairs to the Seawall since 1982." Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 355, 361 P.3d 1243, 1258 (App. 2015).

An implied dedication requires "an offer and acceptance of dedication." In re Banning, 73 Haw. 297, 304, 832 P.2d 724, 729 (1992). "When there is no express offer, the offer may be implied under the circumstances and the acceptance may also be implied by the nature of the public use." Id. at 305, 832 P.2d at 729; see also Maui Ranch Estates Owners Ass'n v. Maui Cty., 6 Haw. App. 414, 421, 724 P.2d 118, 123 (1986) (common law implied dedication occurs "as by acts and conduct which manifest an intent to give the property for public use"); Wemple II, 103 Hawai'i 385, 397, 83 P.3d 100, 112 (2004) (whether implied dedication occurred is a question of the parties' intent). For public use to effectuate an implied dedication, it must continue for a period longer than the number of years

required to result in a prescriptive easement.[29]  Banning, 73 Haw. at 308, 832 P.2d at 730 (citing The King v. Cornwell, 3 Haw. 154, 155, 161-62 (Haw. Kingdom 1869)).

Generally, the effect of a common law implied dedication is the creation of an easement over the relevant property in favor of the State.  See Wemple II, 103 Hawai'i at 397, 83 P.3d at 112 (noting that the result of an implied dedication of a privately owned road would be the creation of an easement over the road); see also 26 C.J.S. Dedication § 2 (2011) ("The right conferred by common-law dedication is only an easement . . . .");  23 Am. Jur. 2d Dedication § 3 (2013) ("[A] right conferred by common law dedication is usually a mere easement while in most statutory dedications, the fee of the property is in the public authority to which the dedication was made.").

In this case, the circumstances reflect an intent to effectuate a common law implied dedication resulting in an easement in favor of the public over and across the Seawall.  See Wemple II, 103 Hawai'i at 397, 83 P.3d at 112.  Specifically, both the private owners' offer and the State's acceptance of the

---

[29]     Prior to 1973, the relevant prescriptive period was ten years. See HRS § 657-31 (1968) (setting prescriptive period at ten years).  In 1973, the Hawai'i State Legislature changed the prescriptive period to twenty years. See 1973 Haw. Sess. Laws Act 26, § 4 at 32; HRS § 657-31 (1993) (setting prescriptive period at twenty years).

dedication are clearly implied from the facts surrounding the public's use of the Seawall and the State's own statements and its repeated repairs and maintenance of the Seawall.[30]

The parties stipulated to extensive evidence regarding the State's repairs to the Seawall in at least 1982, 1984, and 1993; the parties also stipulated that local and state appropriations were made by the relevant legislative bodies in contemplation of further repairs in at least 1989, 1992, and 2006.  The parties further agreed to the entry into evidence of documents in which representatives of the State--including the State's Deputy Attorney General--asserted that "the State has the responsibility to maintain the public right of way over the Seawall," the Seawall has been used by "residents and beachgoers to traverse along the shores of Waikiki Beach" since at least 1930, and "the State has a right-of-way over all the seawalls and walkways."  Testimony at trial likewise demonstrated that members of the public have continuously and freely used the Seawall for recreational purposes since at least 1952.  Both the ICA and the circuit court determined, and the parties do not dispute, that the "public has used the Seawall for both shoreline and ocean access for decades and has done so without

---

[30]    The State does not dispute the circuit court's findings of fact or other relevant underlying facts of this case in its application for writ of certiorari to this court.

any apparent interference from any private landowners along the Gold Coast."  Gold Coast Neighborhood Ass'n, 136 Hawai'i at 354-55, 361 P.3d at 1257-58.

These facts are more than sufficient to raise a rebuttable presumption of implied dedication.  See Banning, 73 Haw. at 308, 832 P.2d at 730 (continuous adverse public use unopposed and acquiesced in for a period longer than the prescriptive period raises a rebuttable presumption of implied dedication (citing Cornwell, 3 Haw. 154)).  No evidence was presented to rebut this presumption, and in fact, the State conceded in its trial memorandum that "[a]dmittedly members of the public routinely" traverse the Seawall and "use the path." Further, the State itself stipulated to the facts of its decades' worth of repairs and maintenance of the Seawall.  In light of the undisputed evidence in this case, neither the ICA nor the circuit court erred in concluding that the State obtained "an easement over and across the Seawall by implied dedication."[31]  Gold Coast Neighborhood Ass'n, 136 Hawai'i at 355, 361 P.3d at 1258.

---

[31]     Despite the fact that the public undoubtedly benefits from the preservation of access to Hawaii's shoreline, see Banning, 73 Haw. at 309-10, 832 P.2d at 731, the dissent seeks to characterize our analysis in this case as leading to an "unfair result" in part because the Gold Coast property owners allegedly "reap all of the rewards" that the Seawall provides. Dissent at 36 (emphasis added).  This ignores the very core of this case-- namely, that the public also reaps the rewards of the Seawall by using it to

(continued. . .)

The State thus has "the right and the duty" to maintain the surface of the Seawall over and across which it has an easement.  See Levy v. Kimball, 50 Haw. 497, 498, 443 P.2d 142, 144 (1968) ("It is a well established rule that an owner of [an] easement has the right and the duty to keep it in repair."); see also Wemple II, 103 Hawai'i at 397, 83 P.3d at 112 (observing that "[w]hether an easement exists" by virtue of common law implied dedication "is significant because, as this court has held, 'an owner of an easement has the right and the duty to keep it in repair'" (quoting Levy, 50 Haw. at 498, 443 P.2d at 144)).  Additionally, any liability potentially arising in the future stemming from the State's easement would be determined by "degree of control rather than mere ownership" of the easement.  Wemple II, 103 Hawai'i at 393, 83 P.3d at 108 (citing Wemple I, 102 Hawai'i 27, 72 P.3d 499 (App. 2002), rev'd, 103 Hawai'i 385, 83 P.3d 100 (2004)).

However, we observe that unless otherwise specified between the parties, "[j]oint use" of an easement and any

(. . .continued)

access the ocean, and it has continued to do so for many decades.  Our determination that the State holds an easement over and across the Seawall in favor of the general public signifies that the Seawall will "inure to the benefit of all the people of Hawaii," State v. Zimring, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977), who will be able to continue using it in order to access the Waikīkī coastline.

improvements thereon may "give[] rise to an obligation to contribute jointly to the costs reasonably incurred for repair and maintenance."  Restatement (Third) of Prop.: Servitudes § 4.13(3) (Am. Law Inst. 2000) (setting forth principles relating to relative duties to repair and maintain easements).[32]  In Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., for example, this court affirmed a lower court's ruling that an easement holder was "partly responsible" for costs of repair and maintenance relating to an easement which was used jointly by the holder and servient estate.  100 Hawai'i 97, 108-09, 58 P.3d 608, 619-20 (2002).  We reasoned in that case that because "the easement [was] being utilized by both the easement holder . . . and the servient," the easement holder had a legal obligation "to contribute [to] the reasonable costs of repair and maintenance" together with the servient estate.  Id. at 109, 58 P.3d at 620; see also 28A C.J.S. Easements § 226 (2008) ("When joint regular use of the easement is made by both the dominant and servient estates, both estates have the obligation to

---

[32]    The Restatement (Third) of Property also specifies that "[i]n allocating costs" for maintenance and repair between the owner of the servient estate and the owner of the easement, factors that should be considered include but are not limited to: (1) "the values of their respective contributions to construction and improvement of any facilities for enjoyment of the easement . . . including the value of the land contributed by the servient owner," (2) "the frequency and intensity of use" by the servient owner and the easement owner, and (3) "the value of any other contributions that enhance the value or the servitude or the servient estate."  Restatement (Third) of Prop.: Servitudes § 4.13 cmt. d.

contribute jointly to the costs of reasonable repairs unless the easement itself indicates otherwise."); Village Green Condo. Ass'n v. Hodges, 114 A.3d 323, 327-29 (N.H. 2015) (observing that this rule is based on "the principle that, by using the easement, both the dominant and servient estates contribute to its wear and deterioration and, therefore, distribution of the burden of easement maintenance and repair between both estates is equitable and just").  Consistent with these principles, the State in this case will be jointly responsible with the relevant property owners for the repair and maintenance of the surface of the Seawall--over and across which the State has an easement--in accordance with equitable considerations relating to their relative use, enjoyment, and contributions to the Seawall.[33]

---

[33]     Thus, contrary to the dissent's assertion, the State will not be required to "foot the bill" for the entirety of the Seawall's upkeep, nor is it under "no legal obligation" to contribute to its repair and maintenance. Dissent at 36-37.  Additionally, it would be inappropriate for this court to speculate on a "calculation to determine the parties' contributory shares," dissent at 37, and such a determination is best left to a trial court in the first instance.  See, e.g., Wailea Resort Co., 100 Hawai'i at 103, 109, 58 P.3d at 614, 620 (affirming apportionment of costs where, following a bench trial, the trial court ruled that joint users of easement were jointly responsible for repair and maintenance costs of easement "in relative proportion" to parties' usages).

        Relatedly, the dissent contends that under our analysis, the State may not "tear down" the entirety of the Seawall if it deems its apportionment of repairs too costly.  Dissent at 36.  We note that the State possesses an easement interest only over and across the surface of the Seawall, but that the State may exercise its authority and control over the public's use of its easement consistent with applicable legal principles. See Levy, 50 Haw. at 498, 500, 443 P.2d at 144, 145 (describing various courses of action that the State could pursue to fulfill its duty of care to

(continued. . .)

### C.    Statutory Surrender Under HRS § 264-1(c)(2)

In addition to asserting that various provisions of the Hawaii Revised Statutes operate to preclude the implied dedication of private property absent the State's explicit acceptance, the State also contends that these same statutes operate to require the State's formal consent as an additional element to surrender under HRS § 264-1(c) (2007).  The circuit court and the ICA each rejected this argument and concluded that the Seawall and the real property under the Seawall had been surrendered to the State.  Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 355-56, 361 P.3d 1243, 1258-59 (App. 2015).  Although the State's formal consent is not required to effectuate a surrender under HRS § 264-1(c)(2), surrender of the Seawall to the State nevertheless failed to occur in this case because the State did not hold a preexisting express easement over the Seawall as provided by this court's decision in Levy v. Kimball, 50 Haw. 497, 443 P.2d 142 (1968).

---

(. . .continued)

maintain its easement "over [the] seawall" in a "safe condition," such as "the construction of a handrail on the makai edge of the seawall, or closing of the seawall to pedestrian traffic, or the posting of signs giving notice of its condition").

### i.    HRS § 264-1 and <u>Levy v. Kimball</u>

HRS § 264-1(c)(2) dates back to the enactment of "The Highways Act, 1892," by Queen Lili'uokalani and the legislative assembly of the Kingdom of Hawai'i, which set special rules for statutory dedication and surrender of highways and roads and included the first codification of the present-day surrender statute.  See Susan E. Jaworowski, <u>Roads in Limbo: An Analysis of the State-County Jurisdictional Dispute</u> 8, Legislative Reference Bureau Report N. 11 (1989).  This first iteration of the surrender statute required that the Minister of the Interior expressly accept each surrender of a road, alley, street, way, lane, court, place, trail, or bridge.  See <u>id.</u>  By 1947, however, the surrender statute had eliminated the requirement of the State's acceptance when such properties were surrendered to the state government,[34] but retained the provision requiring formal acceptance with respect to surrender to the various counties.[35]

---

[34]    See 1947 Haw. Sess. Laws Act 142, § 1 at 252 ("Such surrender shall be deemed to have taken place if no act of ownership by the owner of any such road, alley, street, way, lane, trail or bridge has been exercised for five years <u>and when, in the case of a county highway, in addition thereto, the board of supervisors of the city and county or county has, thereafter, by a resolution, adopted the same as a county highway</u>." (emphasis added)).

[35]    The difference in statutory requirements with respect to surrender to the State versus surrender to the counties existed at commencement of this litigation, see <u>supra</u>, and the plain language of HRS § 264-1(c)(2) indicates that formal approval is not required when land is

(continued. . .)

The codification of HRS § 264-1(c)(2) as it existed at the time this litigation was initiated authorizes the surrender of certain private roads and highways for use by the public, and it provided in relevant part as follows:

> (c) All roads, alleys, streets, ways, lanes, trails, bikeways, and bridges in the State, opened, laid out, or built by private parties and dedicated or surrendered to the public use, are declared to be public highways or public trails as follows:
>
> . . .
>
>> (2) Surrender of public highways or trails shall be deemed to have taken place if no act of ownership by the owner of the road, alley, street, bikeway, way, lane, trail, or bridge has been exercised for five years and when, in the case of a county highway, in addition thereto, the legislative body of the county has, thereafter, by a resolution, adopted the same as a county highway or trail.

HRS § 264-1(c)(2) (2007).  Therefore, HRS § 264-1(c)(2) sets as a threshold rule that only roads, alleys, streets, ways, lanes, trails, bikeways, and bridges may be "surrendered" within the meaning of the statute.  Id.

The term "seawall" is not included in the categories of properties that may be surrendered to the State pursuant to

---

(. . .continued)

surrendered to the State.  See HRS § 264-1(c)(2) (surrender "shall be deemed to have taken place" if no act of ownership has been exercised for five years "and when, in the case of a county highway, in addition thereto, the legislative body of the county has, thereafter, by a resolution, adopted the same as a county highway or trail").  Because the plain language of the statute only requires the formal acceptance of surrendered roads and highways when a county is the grantee, the argument of the State and of the dissent, dissent at 26, that various disparate statutes operate to modify the unambiguous text of HRS § 264-1(c)(2) and impose a requirement of such formal acceptance when the State is the grantee is contrary to the clear text of the statute itself.

HRS § 264-1(c)(2). This court has held, however, that a seawall can properly fit within the general ambit of the statute when it has been expressly opened up as a path of travel for the public. Levy v. Kimball, 50 Haw. 497, 443 P.2d 142 (1968). In Levy, a woman was injured after falling from the top of a seawall in Waikīkī. Id. at 497-98, 443 P.2d at 143. Seeking damages for her injuries, the woman filed suit against, inter alia, the State of Hawaiʻi, which had previously "acquired an easement over [the] seawall for the express purpose of providing a path for public travel."[36] Id. at 498, 443 P.2d at 144.

The trial court determined that the State was not negligent in maintaining the seawall and that it was therefore not liable for the woman's injuries. Id. at 498-99, 443 P.2d at 144. On appeal, the State contended that its preexisting easement expressly opening the surface of the seawall as a path of public travel did not require it to maintain the seawall

_____

[36]    The Levy court's description of the easement indicates that it was expressly granted to the State of Hawaiʻi. 50 Haw. at 498, 443 P.2d at 144; see also Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co., 100 Hawaiʻi 97, 109, 58 P.3d 608, 620 (2002) (noting that in Levy, "[t]he State of Hawaiʻi owned an easement over the seawall that had been obtained for the purpose of providing a path for public travel"); Steigman v. Outrigger Enter., Inc., 126 Hawaii 133, 139, 267 P.3d 1238, 1244 (2011) (describing the seawall in Levy as "state-controlled"); Friedrich v. Dep't of Transp., 60 Haw. 32, 37, 586 P.2d 1037, 1041 (1978) (stating that the seawall in Levy was used by the public as a thoroughfare, which purpose had been "provided by the State"), superseded by statute as recognized in Steigman, 126 Hawaii 133, 267 P.3d 1238. It is noted that the parties' stipulations and the circuit court's findings of fact in this case also confirm that the certificate of title to the property on which the seawall in Levy was located reflected an express easement over the seawall in favor of the State.

because it had only a nonpossessory intangible interest in the footpath. Id. at 499, 443 P.2d at 144. This court noted that it was a "well established rule" that the owner of an easement "has the right and the duty to keep it in repair." Id. at 498, 443 P.2d at 144. And while "it is the control and not the ownership [of the property] which determines liability," we noted that the State had "admitted that it control[led] the seawall." Id. at 499, 443 P.2d at 144 (quoting In re Taxes Victoria Ward, 33 Haw. 235 (Haw. Terr. 1934)).

This court then quoted the predecessor to HRS § 264-1, which at the time, stated that "all roads, alleys, streets, ways, lanes, trails and bridges in the Territory, opened, laid out or built by private parties and dedicated or surrendered to the public use, are declared to be public highways." Id. (quoting Revised Laws of Hawai'i (RLH) § 142-1 (1955)). We considered that "[a]lthough a seawall is not expressly mentioned in the above enumeration, it can be fairly implied that a seawall such as that which is in question here which is used as a public thoroughfare is included in the term 'public highwasy' [sic]." Id. (emphasis added). Thus, we determined that the particular seawall at issue in the case--over which the State held a preexisting express easement for the specific purpose of opening up a pathway for public travel--constituted a "public highway" within the meaning of Hawaii's surrender statute. Id.

The Levy court therefore concluded that seawalls will fall within the scope of HRS § 264-1(c)(2) when the State possesses a preexisting express easement over the seawall that opens it up to the public as a highway or thoroughfare.  Id.

The conclusion in Levy was subsequently confirmed in In re Banning, 73 Haw. 297, 312, 832 P.2d 724, 732 (1992).[37]  In Banning, after determining that a parcel of accreted beachfront property had not been impliedly dedicated to the State, this court considered the State's argument that the public had acquired rights in a trail located on the property by virtue of surrender under HRS § 264-1.  73 Haw. at 312, 832 P.2d at 732. In rejecting this argument, we cited Levy, 50 Haw. 497, 443 P.2d 142.  We concluded that "unlike the situation here, at the time of the trip and fall on the seawall in Levy, the State already held an easement in favor of the general public for use of the seawall as a path of travel."  Banning, 73 Haw. at 312, 832 P.2d at 732 (emphasis added).  Thus, because the State held no

---

[37]     Following our decision in Levy and before our decision in In re Banning, 73 Haw. 297, 312, 832 P.2d 724, 732 (1992), the Ninth Circuit Court of Appeals in Jones v. Halekulani Hotel, Inc., 557 F.2d 1308, 1310 (9th Cir. 1977), determined that the State had acquired a prescriptive easement over a seawall by "[u]se which [was] constant, uninterrupted, and peaceful."  The court then briefly noted that a prescriptive easement over a seawall in favor of the State had been characterized by this court in Levy as a public thoroughfare or highway within the meaning of HRS § 264-1.  Id. at 1311. Thus, although the Jones court may have noted a relation between the seawall at issue in its case and HRS § 264-1 generally, it was not called upon to interpret or apply that statute's surrender provision.

preexisting easement over the trail, the Banning court determined that surrender under HRS § 264-1 did not apply.[38]  Id.

This court's decisions in Levy and Banning are also reinforced by the nature of the surrender statute.  Hawai'i appears to be "one of the few jurisdictions which have provided, at one time or another, for vesting the fee of a highway or road laid out by a private party and abandoned to the public in the central government."  In re Kelley, 50 Haw. 567, 579, 445 P.2d 538, 546 (1968) (discussing predecessor statute to surrender under HRS § 264-1(c)(2)).  Under HRS § 264-1(c)(2) as it existed when proceedings were initiated in this case, certain roads and highways are surrendered after only five years of no acts of ownership.  See HRS § 264-1(c)(2).[39]  The fact that ownership is automatically "deemed" surrendered to the State after such a relatively brief period counsels in favor of an interpretation

_____

[38]    After concluding that the Levy court's reliance on HRS § 264-1 was distinguishable because in that case, the State held a preexisting easement over the seawall, the Banning court also noted that the disputed trail had not been built or laid out by private parties as required by the surrender statute.  Banning, 73 Haw. at 312, 832 P.2d at 732.

[39]    Amendments to the surrender statute enacted by Act 194 of the 2016 legislative session delete and replace the surrender statute at HRS § 264-1(c)(2) with a section on "[c]ondemnation of public highways."  See 2016 Haw. Sess. Laws Act 194, § 3.  Pursuant to this new process, the State and county may initiate condemnation proceedings over public highways, roads, alleys, streets, ways, lanes, bikeways, bridges, or trails.  Id.  Private parties are not entitled to initiate condemnation proceedings, but may "petition the mayor of the county" in which the road or highway is located to do so.  Id.  Thus, surrender of roads and highways after five years without an act of ownership will no longer be deemed to have occurred under HRS § 264-1(c)(2) (Supp. 2016).

of the statute that is more narrow than broad when considering a seawall not enumerated within HRS § 264-1(c)(2). The surrender of total ownership rights in a seawall or other similar structure after only five years, pursuant to a transportation and highways statute, may, for example, operate to unexpectedly deprive private property owners of such rights.[40] These considerations inform an interpretation of HRS § 264-1(c)(2) that includes a seawall only as contemplated by our decision in Levy: namely, that a seawall falls within the purview of the statute where it is subject to a preexisting express easement in favor of the State clearly opening the seawall up as a pathway for public travel. 50 Haw. at 498-99, 443 P.2d at 144.[41]

---

[40] Consider, for example, that in contrast to the five-year requirement for surrender under HRS § 264-1(c)(2), a common law implied dedication evidenced by continuous public use may only be established after such use of the property has continued for over twenty years. See Banning, 73 Haw. at 308, 832 P.2d at 730. Even where public use has continued for over twenty years, such use only creates a rebuttable presumption of an implied dedication. Id. at 307-08, 832 P.2d at 730. Further, if a party does not successfully rebut the presumption of a dedication, the State is merely granted an easement over, rather than ownership of, the property. Wemple II, 103 Hawai'i 385, 397, 83 P.3d 100, 112 (2004).

[41] The dissent disagrees with this reading of the caselaw, in part based on its contention that neither Levy, 50 Haw. 497, 443 P.2d 142, nor Banning, 73 Haw. 297, 832 P.2d 724, "expressly states that such a requirement is necessary under HRS § 261-1." Dissent at 16 (emphasis added). However, a seawall is not enumerated in the categories of property subject to surrender under HRS § 264-1. Levy represents the sole case in this jurisdiction to consider a particular seawall to fall within the ambit of the statute, and, as argued by the State, the decision emphasized the legal significance of that seawall's express easement in favor of the State. 50 Haw. at 499, 443 P.2d at 144. Subsequently in Banning, we reaffirmed the importance of the Levy seawall's preexisting express easement. Banning, 73 Haw. at 312, 832 P.2d at 732. Thus, based on the statute and its caselaw, we reaffirm our conclusion that a seawall falls within the ambit of HRS § 264-1(c)(2) when it

(continued. . .)

**ii.    The State does not own the Seawall by virtue of surrender**

As stated, this court's decision in Levy concluded that a seawall may fall within the scope of HRS § 264-1(c)(2) when there is a preexisting express easement in favor of the State clearly opening it up and identifying it as a pathway for public travel.  50 Haw. at 499-500, 443 P.2d at 144-45.  Under this authority, a seawall over which the State holds a preexisting express easement opening the seawall up as a pathway for public travel will be deemed surrendered to the State if it was opened, laid out, or built by private parties and if no act of ownership has been exercised by its owner for five years.  See HRS § 264-1(c)(2).

In this case, the parties stipulated that the State held a preexisting express easement only over a portion of the Seawall located at TMK No. 3-1-033:009.  However, title to TMK No. 3-1-033:009 is registered in land court, and property registered in land court is not subject to the surrender statute.  See HRS § 501-87 (2006) (land registered in land court is not subject to surrender under HRS § 264-1).

_____

(. . .continued)

is subject to a preexisting express easement in favor of the State clearly establishing it as a thoroughfare for public travel.

Because the State held no preexisting express easements over portions of the Seawall subject to HRS § 264-1(c)(2), the State does not own the Seawall or the real property underneath the Seawall by virtue of surrender, and the circuit court and the ICA erred in so holding. Gold Coast Neighborhood Ass'n, 136 Hawai'i at 355-56, 361 P.3d at 1258-59.

### D.    Attorneys' Fees and Costs

Lastly, we address the State's appeal of the ICA's ruling that Gold Coast was entitled to attorneys' fees and costs. Although the circuit court denied Gold Coast's request for attorneys' fees and costs on the basis of sovereign immunity, the ICA vacated this ruling of the circuit court and determined that fees and costs were permissible because the State had filed its own complaint against Gold Coast and "'the doctrine of sovereign immunity is unavailing and inapposite' when the case 'deals with a suit initiated by the State.'" Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 357, 361 P.3d 1243, 1260 (App. 2015) (alteration omitted) (quoting State ex rel. Anzai v. City & Cty. of Honolulu, 99 Hawai'i 508, 515-16, 57 P.3d 433, 440-41 (2002)). On certiorari, the State contends that the ICA erred in awarding attorneys' fees because the filing of its own lawsuit for declaratory relief did not waive its sovereign immunity.

69

"The doctrine of sovereign immunity 'refers to the general rule, incorporated in the Eleventh Amendment to the United States Constitution, that a state cannot be sued in federal court without its consent or an express waiver of its immunity. The doctrine . . . also precludes such suits in state courts.'" Nelson v. Hawaiian Homes Comm'n, 130 Hawai'i 162, 168, 307 P.3d 142, 148 (2013) (quoting Sierra Club v. Dep't of Transp., 120 Hawai'i 181, 225-26, 202 P.3d 1226, 1270-71 (2009)). Thus, the State as sovereign is generally "immune from suit except as it consents to be sued." Id. (quoting Figueroa v. State, 61 Haw. 369, 381, 604 P.2d 1198, 1205 (1979)).

The State's sovereign immunity does not bar actions seeking prospective declaratory or injunctive relief. See id. (observing that sovereign immunity did not bar plaintiffs' underlying claims for declaratory and injunctive relief); see also Sierra Club, 120 Hawai'i at 226, 202 P.3d at 1271 (recognizing that sovereign immunity does not bar actions seeking prospective relief). However, because sovereign immunity bars actions for damages against the State, and because "an award of costs and fees to a prevailing party is inherently in the nature of a damage award," requests for attorneys' fees and costs against the State are generally barred unless there is a "clear relinquishment" of the State's immunity. Sierra Club,

70

120 Hawai'i at 226, 202 P.3d at 1271 (quoting Fought & Co., Inc. v. Steel Eng'g & Erection, Inc., 87 Hawai'i 37, 51, 951 P.2d 487, 501 (1998); Bush v. Watson, 81 Hawai'i 474, 481, 918 P.2d 1130, 1137 (1996)); see also Kaleikini v. Yoshioka, 129 Hawai'i 454, 467, 304 P.2d 252, 265 (2013) (observing that a statute purporting to waive sovereign immunity is to be "strictly construed . . . in favor of the sovereign" (quoting Taylor-Rice v. State, 105 Hawai'i 104, 110, 94 P.3d 659, 665 (2004))). Generally, "the State has waived immunity to suit only to the extent as specified in HRS chapters 661 and 662." Kaleikini, 129 Hawai'i at 467, 304 P.2d at 265 (observing that HRS § 661-1(1) (1993) includes a waiver of sovereign immunity for claims against the State that are based on a statute).

Gold Coast does not argue that its claims are founded on any statute operating to waive the State's sovereign immunity. Rather, Gold Coast contends, and the ICA concluded, that the State waived its sovereign immunity in this case because it filed its own complaint for declaratory relief against Gold Coast. Gold Coast Neighborhood Ass'n, 136 Hawai'i at 357, 361 P.3d at 1260. In support of this contention, Gold Coast and the ICA place sole reliance on this court's statement in Anzai, 99 Hawai'i at 515-16, 57 P.3d at 440-41, that because

the case "deal[t] with a suit initiated by the State, the doctrine of sovereign immunity [was] unavailing and inapposite."

Anzai centered on a dispute between the State of Hawai'i and the City and County of Honolulu (the County), in which the State claimed that it was exempt from real property taxes levied by the County as a result of recently enacted state legislation; the County, in turn, discounted the legislation and required the State to pay the taxes. 99 Hawai'i at 510, 513, 57 P.3d at 435, 438. The State filed a lawsuit against the County in order to resolve the dispute, alleging in part that the County was precluded from assessing real property taxes against the State based on "the doctrine of sovereign immunity." Id. In reviewing the trial court's grant of summary judgment in favor of the County, this court observed "[p]reliminarily" that the State's reliance on the "doctrine of sovereign immunity" was "misleading." Id. at 515, 57 P.3d at 440. The Anzai court explained that the "doctrine of sovereign immunity" referred to the general rule that a state cannot be sued in federal or state court without an express waiver of its immunity. Id. The court next reasoned, "However, because this case deals with a suit initiated by the State, the doctrine of sovereign immunity is unavailing and inapposite." Id. at 515-16, 57 P.3d at 440-41. The Anzai court then proceeded to explain that the "immunity" claimed by the State was not based on "sovereign immunity," but

72

rather, on "the constitutional rule of tax immunity." Id. at 516, 57 P.3d at 441. "Keeping this clarification in mind," the court then "turn[ed] to the questions presented by [the] appeal," which involved no further discussion of the State's sovereign immunity. Id.

As an initial matter, we note that the dispositive issue in Anzai was whether the constitutional rule of tax immunity or certain state legislation precluded the County from collecting real property taxes from the State. Id. at 510, 57 P.3d at 435 (concluding that neither basis immunized the State from such taxation by the County). The State's reliance on the doctrine of sovereign immunity was "unavailing and inapposite" because rather than argue that it was immune from suit, the State contended that it was immune from taxation by the County. Id. at 513, 57 P.3d at 438. Thus, it was not the doctrine of sovereign immunity in Anzai that could be relied upon to argue that the County could not levy taxes against the State, but rather, the constitutional rule of tax immunity. Id. at 516-19, 57 P.3d at 441-44.[42] The parties' arguments did not relate to the State's ability to be sued or pertain to any purported

_____

[42] We further note that no court of this jurisdiction (or any other jurisdiction) has relied on this statement in Anzai, 99 Hawai'i at 515-16, 57 P.3d at 440-41, (other than the ICA decision in this case) for the proposition that the State's initiation of legal proceedings waives its sovereign immunity.

waiver of the State's sovereign immunity with respect to damages or attorneys' fees.[43]

Additionally, although the doctrine of sovereign immunity was "unavailing and inapposite" in Anzai, the procedural posture of the case in Anzai differs substantially from the procedural history of the present case. See id. In Anzai, the State filed the complaint that initiated the lawsuit and sought relief from taxation by the County. Id. The State in Anzai did not argue that it was protected from suit based on sovereign immunity, nor was the issue of damages or attorneys' fees raised.

In this case, by contrast, Gold Coast initiated the legal proceedings. Although the State filed its own complaint several years after Gold Coast's initial complaint, the State's complaint was limited to the subject matter raised by Gold Coast's claims in the case. Like Gold Coast, the State sought declaratory relief relating to the State's responsibility to maintain the Seawall. Further, the State represented that it filed its complaint because, after the circuit court's ruling on indispensable parties, the State was concerned that individual

---

[43] To this extent, Anzai therefore does not provide authority for the proposition that when the State initiates an action solely for prospective relief, it automatically waives its sovereign immunity as to damages or attorneys' fees. 99 Hawai'i 508, 57 P.3d 433.

74

property owners and other associations would not be explicitly bound by a ruling on Gold Coast's complaint.  Given the circumstances and procedural history of this case, we do not conclude that the State's filing of its complaint for declaratory relief in this case represented a "clear relinquishment" of the State's sovereign immunity.[44]  Sierra Club, 120 Hawai'i at 226, 202 P.3d at 1271 (quoting Bush, 81 Hawai'i at 481, 918 P.2d at 1137).[45]

In addition to ruling that Gold Coast was entitled to attorneys' fees, the ICA also determined that Gold Coast was entitled to costs pursuant to HRS § 607-24.  Gold Coast Neighborhood Ass'n, 136 Hawai'i at 357, 361 P.3d at 1260; see also HRS § 607-24 (1993) ("In all cases in which a final judgment or decree is obtained against the State . . . any and all deposits for costs made by the prevailing party shall be

_____

[44]   Alternatively, Gold Coast argued before the ICA that it was entitled to attorneys' fees based on this court's inherent powers pursuant to HRS § 602-5(a)(6) (1993 & Supp. 2004).  In support of this argument, Gold Coast cites to CARL Corporation v. Department of Education, 85 Hawai'i 431, 460, 946 P.2d 1, 30 (1997).  However, this court's decision in CARL Corporation is distinguishable from the present case, and Gold Coast has not demonstrated that the CARL Corporation decision supports an award of attorneys' fees here.

[45]   Because this court concludes that sovereign immunity bars an award of attorneys' fees against the State, we do not address Gold Coast's claim regarding the private attorney general doctrine.  See Nelson, 130 Hawai'i at 172, 307 P.3d at 152 (observing that the State's sovereign immunity "bars an award of appellate attorneys' fees . . . based on the private attorney general doctrine").

returned to the prevailing party, and the prevailing party shall be reimbursed by the State . . . ."). In so ruling, the ICA found that the circuit court had erred in concluding that costs, like attorneys' fees, were barred by sovereign immunity. Gold Coast Neighborhood Ass'n, 136 Hawai'i at 357, 361 P.3d at 1260.

The State does not challenge on certiorari the ICA's ruling that sovereign immunity does not bar an award of costs to Gold Coast. This court has concluded that HRS § 607-24 "waives the State's immunity for costs 'in all cases in which a final judgment or decree is obtained against the State.'" Kaleikini, 129 Hawai'i at 469 n.14, 304 P.3d at 267 n.14 (quoting HRS § 607-24 (1993)). Because we determine that Gold Coast prevailed on its claim that the State acquired an easement over and across the Seawall by virtue of implied dedication, Gold Coast is entitled to costs pursuant to HRS § 607-24. Id.

In sum, the circuit court correctly concluded that Gold Coast was not entitled to an award of attorneys' fees because the State had not waived its sovereign immunity, and the ICA erred in concluding otherwise. Gold Coast Neighborhood Ass'n, 136 Hawai'i at 357, 361 P.3d at 1260. However, the circuit court erroneously determined that sovereign immunity also barred an award of costs in this case. As held by the ICA, id., Gold Coast is entitled to costs pursuant to HRS § 607-24,

76

which waives the State's sovereign immunity for costs requested

by a prevailing party when a final judgment has been obtained

against the State.  See Kaleikini, 129 Hawai'i at 469 n.14, 304

P.3d at 267 n.14; HRS § 607-24.

## V.    CONCLUSION

The common law doctrine of implied dedication has deep

roots in our jurisprudence, and nearly 150 years of this court's

precedent demonstrate that it is a viable means of transferring

interests in private property to the State for use by the

public.  Given the undisputed evidence in this case, the circuit

court correctly concluded that the State acquired an easement

over and across the Seawall by virtue of implied dedication, and

the ICA properly affirmed this ruling of the circuit court.[46]

Gold Coast Neighborhood Ass'n v. State, 136 Hawai'i 340, 354-55,

361 P.3d 1243, 1257-58 (App. 2015).

However, this court's decision in Levy v. Kimball, 50

Haw. 497, 443 P.2d 142 (1968), requires that for a seawall to

fall within the ambit of the surrender statute, it must be

subject to a preexisting express easement in favor of the State

---

[46]    The dissent argues that our decision "opens the door for other private property owners to receive free services from the State."  Dissent at 38.  We reiterate that this case involves uncontroverted evidence stipulated to by the parties, which demonstrates that for many decades, the surface atop the Seawall has been freely used by the public and frequently repaired and maintained by the State.

clearly and unambiguously opening the seawall up as a pathway for public travel. This requirement was not satisfied with respect to the Seawall in this case. Thus, the circuit court and the ICA each erred in concluding that the Seawall and the real property underneath the Seawall were surrendered to the State pursuant to HRS § 264-1(c)(2). Gold Coast Neighborhood Ass'n, 136 Hawai'i at 355-56, 361 P.3d at 1258-59.

With respect to the State's remaining arguments on certiorari, the circuit court properly determined that Gold Coast had not failed to join indispensable parties and that an award of attorneys' fees was barred by the doctrine of sovereign immunity. The ICA's conclusion that Gold Coast was entitled to attorneys' fees is incorrect because the State's filing of its own complaint for declaratory relief did not waive its sovereign immunity from fees in the circumstances of this case and because Gold Coast has not demonstrated that it merits attorneys' fees on any other basis.

The circuit court did err, however, in concluding that an award of costs was barred by the doctrine of sovereign immunity. The ICA correctly concluded that the circuit court had erred with respect to this issue because HRS § 607-24 (1993) waived the State's sovereign immunity with respect to costs in this case.

Accordingly, the circuit court's November 29, 2013 Findings of Fact and Conclusions of Law is affirmed with respect to the court's determination that the State acquired an easement over and across the Seawall by virtue of common law implied dedication, but it is vacated with respect to its conclusion that the State acquired ownership of the Seawall and the real property under the Seawall by virtue of surrender under HRS § 264-1(c)(2). The ICA's August 7, 2015 Judgment on Appeal is affirmed with respect to its disposition of the circuit court's ruling regarding common law implied dedication but vacated to the extent that it affirmed the circuit court's ruling with respect to surrender under HRS § 264-1(c)(2).

Additionally, the circuit court's May 13, 2014 Order Denying Fees and Costs is vacated with respect to the circuit court's determination that Gold Coast was not entitled to costs and affirmed with respect to its conclusion that Gold Coast was not entitled to attorneys' fees. The ICA's August 7, 2015 Judgment on Appeal is thus further vacated as to its conclusion that Gold Coast was entitled to attorneys' fees but affirmed as to its conclusion that Gold Coast was entitled to costs.

Therefore, the circuit court's February 3, 2014 Final Judgment is affirmed as to its conclusion regarding implied dedication but vacated as to its conclusion regarding surrender, and the case is remanded for proceedings consistent with this

opinion.  On remand, the circuit court shall consider Gold Coast's motion for an award of costs pursuant to HRS § 607-24 following issuance of an amended final judgment in favor of Gold Coast as to its claim of common law implied dedication.

Douglas S. Chin and
William J. Wynhoff
for petitioner

Robert G. Klein,
Jordon J. Kimura,
Randall K. Schmitt, and
Troy J.H. Andrade
for respondent

 /s/ Sabrina S. McKenna
 /s/ Richard W. Pollack
/s/ Jeannette H. Castagnetti

